[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-15850

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 23, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 07-61388-CV-MGC

SOUTHERN GROUTS & MORTARS, INC.,
a Florida corporation,

Plaintiff-Appellant,

versus

3M COMPANY,
a Foreign corporation,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 23, 2009)

Before CARNES, HULL and COX, Circuit Judges.

PER CURIAM:

Southern Grouts & Mortars, Inc. sells swimming pool finishes under the trademark DIAMOND BRITE and would like to register and use the domain name, diamondbrite.com, to advertise and sell its products. The problem for Southern Grouts is that its competitor in the swimming pool finishing industry, 3M Company, owns the registration. When 3M obtained the registration for diamondbrite.com, it also had trademark rights in the DIAMOND BRITE mark but not for use with pool finishing products. Instead, the mark was registered for use in connection with "electronically controlled display panels and signs." Those trademark rights have lapsed, but 3M has continued to re-register the domain name. 3M displays no content on the website and has no intention of doing so. Southern Grouts sued 3M in district court, alleging that 3M's continued registration of the domain name violated the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d), and constituted unfair competition under the Lanham Act, 15 U.S.C. § 1125(a). The district court granted summary judgment in favor of 3M. Southern Grouts appeals that judgment as well as the district court's denial of its motion to amend its second amended complaint.

## I.

Southern Grouts sells exposed quartz aggregate finishes under the registered trademark DIAMOND BRITE. 3M sells ceramic-coated aggregate

finishes under the registered trademark COLORQUARTZ. Southern Grouts uses www.sgm.cc and www.diamondbrite.cc to advertise and distribute its products. Visitors to www.diamondbrite.cc are automatically redirected to www.sgm.cc. Because its website has increased its domestic and international sales, Southern Grouts wants to register another domain name: diamondbrite.com. According to Southern Grouts, its DIAMOND BRITE trademark is more well known than its company name.

The diamondbrite.com domain name, however, has been registered to 3M since 2000. That year 3M expanded one of its forty divisions, the Traffic Safety Systems Division, which is separate from the division that manufactures and sells COLORQUARTZ products. As part of the expansion, 3M bought nearly all the assets of the American Electronic Sign Company. Among those assets were multiple patents and trademarks, including the trademark registrations for two different DIAMOND BRITE marks in connection with "electronically controlled display panels and signs." There were also three domain names, including diamondbrite.com.

3M integrated the Sign Company's business into its Traffic Systems Division and continued to use the www.diamondbrite.com website for eighteen months. By February 2001, the website included a graphic alerting visitors to the

acquisition and provided a link that would take a visitor to 3M's Traffic Safety Division website. In early 2002, visitors to www.diamondbrite.com were automatically re-directed to 3M's Traffic Safety Division website. Then, between April and July 2002, 3M "deactivated" the website, in the sense that a would-be visitor who typed in the domain name would get one of two screens, depending on a browser's settings: a "no page can be displayed" message or a search result display listing alternative websites or spellings.

3M stopped using the DIAMOND BRITE trademark after the transition of products and customers from the Sign Company was complete. 3M decided to do that in part because it was worried that DIAMOND BRITE might dilute its most valuable mark, DIAMOND GRADE, which it has used since 1989 in connection with a retroreflective sheeting material. In August 2002, the United States Patent and Trademark Office cancelled 3M's registration for one of its DIAMOND BRITE trademarks because 3M failed to file a declaration of continued use. By July 2006, 3M's registration of its other DIAMOND BRITE trademark had expired. 3M has, however, continually renewed the registration of the diamondbrite.com domain name.

According to 3M, it has continued to renew the registration of the domain name to avoid the risk that a competitor of its DIAMOND GRADE products

4

would use it to create consumer confusion as to the source of its products. Additionally, 3M has a policy that once it acquires a domain name—by registration, transfer, or purchase—it is strongly presumed that the domain name will be renewed absent an explicit decision to the contrary. 3M re-registered the domain name in 2002, 2003, 2005, 2007, and 2008.

Southern Grouts contacted 3M about the domain name three times before filing the complaint in this lawsuit. In 2002 Southern Grouts sent an email to 3M's Domain Name Administrator noting that the domain name was "not in use" and asking if 3M would "please let [it] take the domain name." It is unclear from the record whether 3M responded. Then in 2005 Southern Grouts' attorney sent 3M a cease and desist letter. That letter claimed that 3M was "using" the diamondbrite.com domain, accused 3M of "cyberpiracy," and demanded that 3M transfer the domain name to Southern Grouts. In its response letter, 3M refused to comply with the demand, denied any wrongful conduct, and invited any questions about or evidence of those claims. Southern Grouts did not accept that invitation.

In 2007 Southern Grouts' attorney sent another letter to 3M which stated that "it appears that the [diamondbrite.com] site has been entirely inactive for more than six (6) years" and asked for "an amicable and cost-effective resolution." 3M responded that its position remained the same. In its response letter, 3M also

5

told Southern Grouts that it would not use the name to compete with Southern Grouts' DIAMOND BRITE products and explained its concern that the domain name would at some time fall into the hands of someone seeking to create confusion with 3M's DIAMOND GRADE product. The next time 3M heard from Southern Grouts was when it filed the complaint against 3M in this case.

Southern Grouts' complaint alleged that 3M's continued registration of the diamondbrite.com domain name violated the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)(1)(A), and constituted unfair competition under the Lanham Act, 15 U.S.C. § 1125(a).[1] Both parties filed motions for summary judgment. About a month later, long after the district court's deadline for amending the pleadings had passed, Southern Grouts filed a motion for leave to amend its second amended complaint based on "new" evidence from the deposition of 3M's Fed. R. Civ. P. 30(b)(6) corporate representative.

The district court denied Southern Grouts' motion for leave to amend its second amended complaint. The next day, the court granted summary judgment in favor of 3M and denied Southern Grout's motion for summary judgment. The

---

[1] Southern Grouts' complaint initially included four other claims, which Southern Grouts has since abandoned. Those claims were for (1) dilution of a famous trademark through tarnishment; (2) dilution of a famous trademark through blurring; (3) tortious interference with business relationships and prospective business relationships, and (4) dilution in violation of Florida Statute § 495.151.

court concluded that Southern Grouts' unfair competition and cybersquatting claims were barred by laches and also were without merit. This is Southern Grouts' appeal.

## II.

We first consider whether the district court abused its discretion in denying Southern Grouts' motion for leave to amend its second amended complaint. On August 5, 2008, Southern Grouts filed that motion based on the deposition testimony of 3M's corporate representative, Fred Zonino. Zonino testified that 3M had purchased a Google AdWord for "diamond brite." An Internet user who runs a Google search for a term that has been purchased as an AdWord will see a "Sponsored Link" to the purchaser's website in a display to the right of the search results. Southern Grouts asserts that information about that purchase supports its unfair competition claim "and likely" its cybersquatting claim too.

Under the district court's scheduling order the deadline to amend pleadings had passed on February 9, 2008. The court denied Southern Grouts' motion to amend because it found that Southern Grouts had not been diligent and had failed to establish good cause for the delay. We review that judgment only for abuse of discretion. Hinson v. Clinch County Bd. of Educ., 231 F.3d 821, 826 (11th Cir.

2000); Tech. Res. Servs. v. Dornier Med. Sys., 134 F.3d 1458, 1464–65 (11th Cir. 1998).

## A.

Southern Grouts inquired into 3M's purchase of Google AdWords for the first time in a set of interrogatories served on May 12, 2008, which was three months after the deadline to amend pleadings had passed. The interrogatory asked 3M to "[i]dentify each and every instance in which 3M has used the term(s) 'diamondbrite,' 'diamond brite,' or any confusingly similar term as a Google AdWord or metatag."[2] 3M responded on June 11, 2008, about a month after the interrogatory was served. 3M answered that "it ha[d] located no information" indicating that either the Traffic Control Materials Division (the division that acquired the DIAMOND BRITE marks and associated domain names) or the Industrial Mineral Products Division (the division manufacturing and selling COLORQUARTZ pool finishing products that competed with DIAMOND BRITE products) had used AdWords for "diamondbrite" or "diamond brite."

---

[2] "Meta tags consist of words and phrases that are intended to describe the contents of a website." N. Am. Med. Corp. v. Axiom Worldwide, Inc., 522 F.3d 1211, 1217 n.2 (11th Cir. 2008). They are "embedded within the website's computer code." Id. Unlike AdWords, meta tags do not result in a display that a user can see. See id. Instead, meta tags affect the results of a search in unseen ways, like changing the rank of results in a list or using the meta tag word in a description of the result. See id. Meta tags are not at issue here.

About two weeks later, on June 23, 2008, 3M served its amended and supplemental responses to those interrogatory answers. It admitted that "[f]or a period of at most three to four months sometime between October 2004 and February 2005, the [Industrial Mineral Products Division] budgeted $500.00 per month total for the purchase of several Google ad words which included 'Diamond Brite.'" The day after 3M amended its interrogatory answer, at a hearing before the district court on an unrelated motion, Southern Grouts' counsel referred to 3M's AdWord purchase as a "shocking" development. Counsel also observed aloud that it was past the deadline for amending pleadings and that "we will take our licks there."

On June 26 and 27, 2008, the parties filed motions for summary judgment. The memorandum supporting Southern Grouts' motion for summary judgment referenced 3M's purchase of AdWords as part of its attempt to establish that 3M had "use[d] in commerce" the trademark DIAMOND BRITE within the meaning of the Lanham Act. That memorandum included a section called "3M has admitted to using [Southern Grouts'] trademark in Google AdWords."

About a month later on July 22, 2008, Southern Grouts deposed Zonino. Zonino was initially scheduled for a deposition on June 5, 2008, but the deposition was postponed at Southern Grouts' request. Zonino testified that 3M's advertising

9

agency had recommended that 3M purchase the term "diamond brite" as part of a Google AdWords campaign for its COLORQUARTZ product because someone who was interested in DIAMOND BRITE may be interested in COLORQUARTZ as an alternative kind of finish. He testified that 3M followed his recommendation and that "diamond brite" was one of the AdWords that the advertising agency bought.

On August 5, 2008, Southern Grouts filed its motion to amend its complaint. The next day 3M again amended its interrogatory response to state that it bought the "diamond brite" AdWord through a third party and that the use of it lasted for three weeks. Over those three weeks, the sponsored link got thirteen hits, resulted in no sales, and caused no known confusion.

The district court denied Southern Grouts' motion for leave to amend its complaint. It found that Southern Grouts' lack of diligence in pursuing its claim foreclosed a finding of "good cause" required for the grant of a motion for leave to amend a complaint outside the time prescribed in the district court's scheduling order.

**B.**

A plaintiff seeking leave to amend its complaint after the deadline designated in a scheduling order must demonstrate "good cause" under Fed. R.

Civ. P. 16(b).  See Sosa v. Airprint Sys., 133 F.3d 1417, 1418 n.2 (11th Cir. 1998) ("[W]hen a motion to amend is filed after a scheduling order deadline, Rule 16 is the proper guide for determining whether a party's delay may be excused."); Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent.").  In Sosa, we upheld the district court's denial of the plaintiff's motion to amend her complaint because the plaintiff's failure to comply with the court's scheduling order resulted from a "lack of diligence in pursuing her claim."  133 F.3d at 1419.  The record supports the district court's conclusion that Southern Grouts similarly lacked diligence in pursuing its claim.[3]

When Southern Grouts finally filed the motion to amend its complaint on August 5, 2008, the deadline to amend pleadings had come and gone five months earlier (on February 9, 2008), both parties had filed their initial briefs in support of

_____

[3] Southern Grouts attempts to distinguish this case from Sosa by pointing out that the plaintiff in that case had the information necessary to seek to amend its complaint before it even filed suit, while Southern Grouts discovered information it needed to file a motion to amend its complaint after the deadline for amending pleadings had passed.  However, that is a distinction without a difference.  As we noted in Sosa, the "good cause standard precludes modification unless the schedule cannot be 'met despite the diligence of the party seeking the extension.'" 133 F.3d at 1418 (citing Fed. R. Civ. P. 16 advisory committee's note).  The lack of diligence that precludes a finding of good cause is not limited to a plaintiff who has full knowledge of the information with which it seeks to amend its complaint before the deadline passes.  That lack of diligence can include a plaintiff's failure to seek the information it needs to determine whether an amendment is in order.  Cf. Oravec v. Sunny Isles Luxury Ventures, L.C., 527 F.3d 1218, 1232 (11th Cir. 2008) (explaining that a plaintiff did not establish good cause by stating that it did not know about the jurisdictional defects of its claims until notified of those defects by the district court after the deadline for amending pleadings).

their motions for summary judgment almost a month earlier (on June 26-27, 2008), and fact discovery had been closed for a few weeks (since July 13, 2008). Although Southern Grouts argues that the delay in filing its motion for leave to amend its complaint was caused by 3M's "stonewalling" its discovery requests relating to its purchase of Google AdWords, Southern Grouts did not serve its first interrogatory about AdWords until three months after the deadline to amend pleadings had passed. Southern Grouts did not depose Zonino until after the deadline had passed for amending pleadings and discovery and after the parties had filed motions for summary judgment. That deposition, originally scheduled for June 5, 2008, had been postponed at least once by Southern Grouts.

We have upheld a district court's denial of a motion to amend pleadings at this stage in the proceedings before. See Lowe's Home Centers, Inc. v. Olin Corp., 313 F.3d 1307, 1315 (11th Cir. 2002) ("[I]t is not an abuse of discretion for a district court to deny a motion for leave to amend following the close of discovery, past the deadline for amendments and past the deadline for filing dispositive motions."). Southern Grouts attempts to distinguish this case from Lowe's by arguing that unlike the plaintiff's motion in that case, its motion did not seek to add a new claim, but instead sought only to add information in support of the unfair competition claim that it had already alleged in its second amended

12

complaint. It argues that 3M's purchase of a Google AdWord for "diamond brite" was just another way in which 3M misused Southern Grouts' trademark and is "precisely" the kind of information "discovery is intended to uncover, and ultimately did uncover."

Even assuming that the AdWord purchase was the type of information discovery is intended to uncover, Southern Grouts dallied too long in discovering it. Southern Grouts lacked diligence, at the very least, because it waited until August 5, 2008 to file a motion to amend its complaint with information that it had known over a month before when it filed a motion for summary judgment. Although Southern Grouts argues that 3M failed to "definitively" admit or deny the purchase and that it never received a "straight answer" until it deposed Zonino on July 22, 2008, there is evidence that Southern Grouts had interpreted 3M's first amended interrogatory answers filed on June 23, 2008 as evidence that 3M purchased the "diamond brite" AdWord.

On June 24, 2008, Southern Grouts' counsel referred to 3M's AdWord purchase as a "shocking" development. In the memorandum supporting its motion for summary judgment filed on June 27, 2008, Southern Grouts asserted that "3M has admitted to using [Southern Grouts'] trademark in Google AdWords." As the district court pointed out, Southern Grouts' later motion to

13

amend the complaint came "after both parties had briefed motions for summary judgment, and [Southern Grouts] even referenced in its motion . . . 3M's use of Google AdWords." Instead of putting 3M on notice of the AdWord allegations it sought to pursue by seeking to amend its complaint, Southern Grouts slid those allegations into its motion for summary judgment, which it filed after 3M had already filed its motion for summary judgment.

The proper procedure at the summary judgment stage would have been to file a motion for leave to amend its complaint. See Gilmour v. Gates, McDonald and Co., 382 F.3d 1312, 1315 (11th Cir. 2004) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a).") By filing its motion for leave to amend its complaint a month later, Southern Grouts waited too late. The district court did not abuse its discretion in denying Southern Grouts' motion for failure to show good cause why it did not amend its complaint before the amendment deadline imposed in the scheduling order or during extensions of that deadline.[4]

---

[4] Southern Grouts asserts that the district court's denial of its motion for leave to amend was solely for the improper purpose of punishing Southern Grouts for its already sanctioned deficiencies in responding to 3M's discovery. Although the district court referred to the "multiple motions to compel filed by 3M and the sanctions entered by the Court against [Southern Grouts] for discovery violations," the court did not rely solely on Southern Grouts' general lack of diligence. Instead, the district court specifically considered the motion to amend. The court observed that Southern Grouts' motion came "well after the deadlines to amend pleadings . . . and complete fact discovery." The court noted that the motion "also [came] after

14

## III.

We next consider whether the district court erred in granting summary judgment to 3M on Southern Grouts' claim that 3M violated the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d). The district court granted summary judgment because it concluded that the claim was barred by laches and that Southern Grouts had failed to show 3M had a "bad faith intent to profit" as required by the statute.

Congress enacted the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d), in 1999. Pub. L. No. 106-133, § 3002(a), 113 Stat. 1536, 1501A-545-546. The Act provides a cause of action for a trademark owner against a person who "has a bad faith intent to profit from [the owner's] mark" and who "registers, traffics in, or uses a domain name" that is identical or confusingly similar to the owner's distinctive mark or that is identical, confusingly similar to or dilutive of the owner's famous mark.[5] 15 U.S.C. § 1125(d)(1)(A)(i)–(ii). The

---

both parties had briefed motions for summary judgment, and [Southern Grouts] even referenced in its motion . . . 3M's use of Google AdWords."

[5] The statute provides:

(A) A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person

(i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and

Act sets out a list of nine non-exclusive factors that "a court may consider" in

determining whether a defendant had "a bad faith intent to profit."[6] 15 U.S.C. §

---

(ii) registers, traffics in, or uses a domain name that--

    (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;

    (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or

    (III) is a trademark, word, or name protected by reason of section 706 of Title 18 [protecting the Red Cross insignia] or section 220506 of Title 36 [protecting trademarks associated with the Olympic Games].

15 U.S.C. § 1125(d)(1)(A).

[6] The nine factors listed in the statute are:

[1] the trademark or other intellectual property rights of the person, if any, in the domain name;

[2] the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

[3] the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

[4] the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

[5] the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

[6] the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any

1125(d)(1)(B)(I).  As other courts have observed, the statute clearly makes consideration of those factors permissive ("may consider" being the key language).  See Virtual Works, Inc. v. Volkswagen of Am., Inc., 238 F.3d 264, 269 (4th Cir. 2001) ("We need not, however, march through the nine factors seriatim because the ACPA itself notes that use of the listed criteria is permissive."); Sporty's Farm L.L.C.  v. Sportsman's Market, Inc., 202 F.3d 489, 498 (2d Cir. 2000) ("[T]he factors are . . . expressly described as indicia that 'may' be considered along with other facts.").

---

goods or services, or the person's prior conduct indicating a pattern of such conduct;

[7] the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

[8] the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

[9] the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section [addressing dilution].

15 U.S.C. § 1125(d)(1)(B)(i).

17

## A.

Southern Grouts' strongest argument that 3M had a bad faith intent to profit is not based on any of the statute's nine permissive factors, but instead focuses on two "unique circumstances" of the case. See Sporty's Farm L.L.C., 202 F.3d at 499. ("The most important grounds for our holding that Sporty's Farm acted with a bad faith intent, however, are the unique circumstances of this case, which do not fit neatly into the specific factors enumerated by Congress but may nevertheless be considered under the statute.").

First, Southern Grouts urges us to consider, as a unique circumstance, that through its registration of the diamondbrite.com domain name, 3M has the ability to monitor the viability and value of Internet traffic, the number of "hits" to [www.diamondbrite.com](www.diamondbrite.com), and the geographic location of all or most of the "hits," which could be used to determine strategic commercial information. The only evidence Southern Grouts offers to support its assertion that 3M had or used that capability, however, was properly ruled inadmissible by the district court. That evidence was the report of expert Robert Moody. Moody's report states that "my expert opinion is that 3M . . . can, and almost certainly does, enjoy a commercial benefit from its ownership of the diamondbrite.com domain by accessing and collecting information from that source." In support of that contention, Moody

18

relies primarily on the general abilities of NeuStar Ultra Services (the company to which 3M outsourced its Domain Name System hosting) to allow a user of those services, such as 3M, to log and analyze statistics from its servers. Although it claims to rely on the parties' discovery and the record, Moody's report provides no specific citations to either one. As the district court pointed out, and Southern Grouts does not dispute, Moody's report "does not purport to explain 3M's actual abilities or actions with regard to diamondbrite.com."

After determining that Moody's report was "so pervaded by conclusory statements as to be almost without value" and that his opinion was connected to the data only by his ipse dixit assertion, the district court ruled that Moody's report was inadmissible. We review a district court's exclusion of an expert report at summary judgment only for abuse of discretion, see Corwin v. Walt Disney Co., 475 F.3d 1239, 1250 (11th Cir. 2007), and conclude that the district court did not abuse its discretion here. See Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, 402 F.3d 1092, 1111 (11th Cir. 2005) ("[A] trial court may exclude expert testimony that is 'imprecise and unspecific,' or whose factual basis is not adequately explained."); see id. ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert." (internal quotation marks

19

omitted)).  Even if the report were admissible, Southern Grouts did not identify which part of the 38 pages of Moody's report supports the idea that 3M had the ability to use its control over the domain name to monitor hits, and there is no evidence that it either intended to or actually did use the domain name in that way. There is also no explanation in the report about how that information would be useful to 3M when there are at least six other registered users of the DIAMOND BRITE mark.[7]  Therefore, Southern Grout's attempt to establish the first "unique circumstance" showing 3M had a bad faith intent to profit from the domain name fails.

The second "unique circumstance" Southern Grouts proffers is that 3M has kept control of the diamondbrite.com domain name, not to display content, but to prevent others from registering it.  To support that contention Southern Grouts points out 3M conceded that it did not need the domain name to display content but admitted that it "continue[d] to renew the domain name registration for diamondbrite.com because . . . it did not want to take the risk that a competitor . . .

_____

[7] Southern Grouts argues that it was improperly prevented from proving that 3M is tracking hits because "the district court did not grant [Southern Grouts] the ability to further inspect computers which . . . were associated with the domain name."  Southern Grouts had filed a motion to compel 3M to produce certain computers that 3M no longer possessed.  Southern Grouts agreed to suspend its pursuit of a motion to compel when 3M offered to let it inspect its operation of its web-based portal and a back-up tape.  Southern Grouts conducted only a remote inspection, and it did not renew its motion to compel until after summary judgment briefing was complete.

20

could obtain the domain name and use it to create confusion among customers and potential customers as to the source of that competitor's retroreflective sheeting products [similar to 3M's DIAMOND GRADE products]." Southern Grouts also points out that 3M re-registered the domain name a month after Southern Grouts sent it a cease and desist letter and then re-registered the domain name again a few months after Southern Grouts filed the complaint in this lawsuit. As further proof of its point, Southern Grouts notes that 3M has a corporate policy of renewing domain names as a default rule.

This circumstance does not, however, tip our analysis toward a conclusion that 3M has violated the Anticybersquatting Consumer Protection Act. Proving "bad faith" is not enough. A defendant is liable only where a plaintiff can establish that the defendant had a "bad faith intent to profit." 15 U.S.C. § 1125(d) (emphasis added). We cannot read the words "intent to profit" out of the statute. See Friends of Everglades v. S. Fla. Water Mgmt. Dist., No. 07-13829, 2009 WL 1545551, at *12 (11th Cir. June 4, 2009) ("[W]e are not allowed to add or subtract words from a statute; we cannot rewrite it."); Nguyen v. United States, 556 F.3d 1244, 1256 (11th Cir. 2009) ("We are not authorized to rewrite, revise, modify, or amend statutory language in the guise of interpreting it. . . .").

21

The Senate Report accompanying the Anticybersquatting Consumer Protection Act bolsters our understanding that a "bad faith intent to profit" is the essence of the wrong that the Act seeks to combat. That report defines cybersquatters as those who:

> (1) "register well-known brand names as Internet domain names in order <u>to extract payment</u> from the rightful owners of the marks;" (2) "register well-known marks as domain names and warehouse those marks <u>with the hope of selling them</u> to the highest bidder;" (3) "register well-known marks <u>to prey on</u> consumer confusion by misusing the domain name to divert customers from the mark owner's site to the cybersquatter's own site;" (4) "target distinctive marks <u>to defraud consumers</u>, including to engage in counterfeiting activities."

<u>Lucas Nursery and Landscaping v. Grosse</u>, 359 F.3d 806, 810 (6th Cir. 2004) (quoting S.Rep. No. 106-140 (1999), 1999 WL 594571, at *5–6 (emphasis added). The report says nothing about those who hold onto a domain name to prevent a competitor from using it.

Congress enacted the Anticybersquatting Protection Act in response to concerns over the "proliferation of cybersquatting—the Internet version of a land grab." <u>Virtual Works, Inc.</u>, 238 F.3d at 267. The practice of holding domain names for ransom with an intent to profit directly from selling the domain name itself is the "paradigmatic harm" targeted by the act. <u>Lucas Nursery</u>, 359 F.3d at 810; <u>see also</u> <u>Schmidheiny v. Weber</u>, 319 F.3d 581, 582 (3rd Cir. 2003) ("The

purpose of the Anti-cybersquatting Act is to 'curtail one form of cybersquatting—the act of registering someone else's name as a domain name for the purpose of demanding remuneration from the person in exchange for the domain name.'") (citing 145 Cong. Rec. S14715 (daily ed. Nov. 17, 1999) (statement of Sen. Lott)); Ford Motor Co. v. Catalanotte, 342 F.3d 543, 549 (6th Cir. 2003) ("Registering a famous trademark as a domain name and then offering it for sale to the trademark owner is exactly the wrong Congress intended to remedy when it passed the ACPA."); cf. Eagle Hosp. Physicians, Inc. v. SRG Consulting, Inc., 561 F.3d 1298, 1307 (11th Cir. 2009) (defining cybersquatting as "'the conduct of one who reserves with a network information center a domain name consisting of the mark or name of a company for the purpose of relinquishing the right to the domain name back to the legitimate owner for a price'" (quoting McCarthy on Trademarks and Unfair Competition, 24:17 (4th ed. 2008))); H.R. Rep. No. 106-412 (1999), 1999 WL 970519, at *5 (identifying cybersquatters as those "who register numerous domain names containing American trademarks or tradenames only to hold them ransom in exchange for money"). Southern Grouts accuses 3M not of a design to sell a domain name for profit but of a refusal to sell one.

As the Tenth Circuit has explained, "[a] defendant could also intend to profit by diverting customers from the website of the trademark owner to the defendant's own website, where those consumers would purchase the defendant's products or services instead of the trademark owner's." Utah Lighthouse Ministry v. Found. for Apologetic Info. and Research, 527 F.3d 1045, 1058 (10th Cir. 2008). But there is no evidence that 3M has done that.

Southern Grouts has failed to establish that 3M had a bad faith intent to profit through the existence of either of the "unique circumstances" it has proffered. It has not established that 3M had any intention to profit from the diamondbrite.com website by selling the domain name registration, by selling or advertising products on the www.diamondbrite.com website to unsuspecting consumers in search of Southern Grouts' DIAMOND BRITE products, or by using the domain name in any other way to obtain a profit.

**B.**

Our conclusion that 3M did not have a "bad faith intent to profit" is not undermined by any of Southern Grouts' arguments challenging the district court's assessment of the nine statutory factors that courts may consider in their discretion. The district court found that five factors favored 3M, two factors

24

favored Southern Grouts, and the two other factors were "inapplicable." We agree.

1.

The five factors favoring 3M are the third, fifth, sixth, seventh, and eighth ones. The third factor is "the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services." See 15 U.S.C. § 1125(d)(1)(B)(i)(III). 3M initially used the diamondbrite.com domain name in connection with the bona fide offering of the product lines it had acquired through its purchase of the American Electronic Sign Company's assets. Even though, as Southern Grouts argues, 3M has not made a bona fide offering of goods in connection with the diamondbrite.com domain name since 3M re-registered the domain name after the lapse in its DIAMOND BRITE trademark rights, the statute plainly refers to "any" prior use. There was that, so this factor does favor 3M.

For the fifth factor to favor Southern Grouts the record must show that 3M: "inten[ded] to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site." See 15 U.S.C. § 1125(d)(1)(B)(i)(V).

25

Southern Grouts points to nothing in the record showing such action with that intent. Instead of identifying how 3M's inactive www.diamondbrite.com website "could harm the goodwill represented by the mark"— as by creating confusion, causing dilution, or being used for purposes of commercial gain—Southern Grouts vaguely asserts that 3M intended to "gain commercial advantage in cyberspace." Even putting aside Southern Grouts' failure to specify what 3M intended to gain by "diverting" consumers to the non-active www.diamondbrite.com website, Southern Grout has failed to submit evidence showing that 3M intended to "divert" potential Southern Grouts customers.[8]

The sixth factor, which considers "the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for

---

[8] Southern Grouts asks us to infer that 3M intended to divert its potential customers for two reasons. First, Southern Grouts asks us to infer a diversionary intent from the fact that "[w]eb users often assume, as a rule of thumb," that a product can be found at a domain name consisting of a company name or trademark followed by ".com." Brookfield Commc'ns, Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1045 (9th Cir. 1999). We agree with the district court that "even if this were a likely occurrence, there is no evidence that . . . this was 3M's intent in acquiring or maintaining the domain name." Second, Southern Grouts asks us to infer a diversionary intent from the deposition testimony of Elizabeth McKee, Executive Vice-President of Southern Grouts, in which she stated that after typing diamondbrite.com into her web browser, she was redirected to a 3M website featuring COLORQUARTZ products and that her attorney and another executive witnessed that event. The district court did not abuse its discretion in disregarding that testimony. The three-page excerpt of McKee's deposition that Southern Grouts filed with its reply brief in the district court did not show that McKee was properly sworn in before testifying. See Carr v. Tatangelo, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003) ("Unsworn statements do not meet the requirements of Fed. Rule Civ. Proc. 56(e) and cannot be considered by a district court in ruling on a summary judgment motion." (internal quotation marks and alteration omitted)).

26

financial gain" favors 3M because it never offered to transfer, sell, or assign the domain name to any party. See 15 U.S.C. § 1125(d)(1)(B)(i)(VI). Instead 3M has consistently refused to turn over the domain name and has repeatedly asserted that it wants to keep the domain name.

The seventh factor, which considers "the person's provision of material and misleading false contact information" when applying for registration or in failing to accurately maintain that contact information, favors 3M because Southern Grouts has produced nothing to indicate that 3M provided any type of false contact information. See 15 U.S.C. § 1125(d)(1)(B)(i)(VII).

The eighth factor also favors 3M. That factor considers "the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names." 15 U.S.C. § 1125(d)(1)(B)(i)(VIII). In its briefs before this Court Southern Grouts does not identify a single domain name, other than diamondbrite.com, that it contends 3M has improperly registered. Southern Grouts did offer eighteen such domain names to the district court. That evidence was called into question by the district court, which, using the research method relied on by Southern Grouts, took judicial notice of the fact that 3M did not actually have registrations for all eighteen domain names identified and that

3M had a legitimate connection to some of them. Without clarifying for us what domain names, if any, Southern Grouts continues to assert that 3M has improperly registered, it vaguely argues that "3M's bad faith can clearly be seen through its registration and/or acquisition of a multitude of domain names all consisting of distinctive marks of others which 3M has no legitimate rights to use." We are unconvinced. Southern Grouts also argues that the registration of the single domain, diamondbrite.com, with knowledge that it incorporates a competitor's mark informs an inference of bad faith, like multiple domain names would. That argument, however, is at odds with the plain meaning of the word "multiple." Id. § 1125(d)(1)(B)(i)(VIII).

## 2.

Although we agree with Southern Grouts, and the district court, that two of the remaining four factors favor Southern Grouts, those factors are not enough to tip the scales in its favor. The first factor, which considers "the trademark or other intellectual property rights of the person, if any, in the domain name" favors Southern Grouts because even though at one time 3M had rights in two DIAMOND BRITE marks, its rights in those marks have lapsed. See 15 U.S.C. § 1125(d)(1)(B)(I).

The ninth factor, which considers "the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous," also favors Southern Grouts. Id. § 1125(d)(1)(B)(IX). The district court determined that DIAMOND BRITE is distinctive and 3M does not challenge that finding.

3.

Southern Grouts argues that the remaining two factors—the second and fourth—also favor it. The district court disagreed. It found that the second factor, which considers "the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person," was inapplicable because diamondbrite.com is not the legal or identifying name of a person. See 15 U.S.C. § 1125(d)(1)(B)(i)(II). We agree. It found that the fourth factor, which considers "the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name," id. § 1125(d)(1)(B)(i)(IV), was also inapplicable because that factor concerns domain names used for "comparative advertising, criticism, comment, or parody" and the diamondbrite.com domain name is not used for any of those purposes, or at all. We agree.

29

In any event, characterizing those two factors as "favoring" Southern Grouts instead of "inapplicable" would not change the result. A court's analysis of whether a defendant had the bad faith intent to profit necessary to a cybersquatting claim is not based on a score card of the statutory factors. As we have already explained, the factors are permissive considerations. See Virtual Works, 238 F.3d at 269; Sporty's Farm, 202 F.3d at 498. Whether the second or fourth statutory factors are counted as favoring Southern Grouts or are considered as neutral because they are "inapplicable" is irrelevant to the outcome. Those two factors offer means for the domain name holder to show good faith reasons for registering the diamondbrite.com domain name. The absence of those two good faith reasons does not rule out a finding of good faith for other reasons.

## C.

Because we agree with the district court that Southern Grouts' claim fails on the merits because it did not show 3M had the requisite bad faith intent to profit, we need not address the court's alternative holding that the laches defense applies to the cybersquatting claim and bars it. See Reyes v. Maschmeier, 446 F.3d 1199, 1205 (11th Cir. 2006) (affirming on one of the district court's grounds, "[w]e do not reach the other grounds discussed by the district court in the disposition of this case"); Unimex, Inc. v. U.S. Dept. of Hous. and Urban Dev., 594 F.2d 1060, 1061

30

(5th Cir. 1979)[9] ("The district court dismissed the complaint for a variety of reasons. Because we find that the United States has not waived its sovereign immunity in cases such as this, we affirm for that reason alone, and do not reach the district court's other grounds for dismissal.").

## IV.

We next consider whether the district court erred in granting summary judgment to 3M on Southern Grouts' claim that 3M engaged in unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a). In granting summary judgment, the district court found that the claim was barred by laches and that Southern Grouts failed to show a use in commerce by 3M and failed to produce sufficient evidence of a likelihood of confusion.

Section 43(a) of the Lanham Act creates civil liability for

[a]ny person who, on or in connection with goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person. . . .

15 U.S.C. § 1125(a)(1).

---

[9] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

Under the plain language of the statute Southern Grouts had to show that 3M "in connection with . . . goods or services . . . use[d] in commerce" the term "diamond brite." Because 3M's diamondbrite.com domain name does not sell or advertise any goods or services, no use of it in commerce is readily apparent. Southern Grouts argues that 3M made use in commerce in three ways.

First, Southern Grouts argues that 3M used its mark in commerce when it used the domain name diamondbrite.com to redirect traffic to its own website promoting its COLORQUARTZ products. The problem with that argument is that the district court found that the deposition testimony of Elizabeth McKee, which was the only evidence of any such re-direction, should not be considered. As we have already explained, refusing to consider that deposition was not an abuse of discretion.

Second, Southern Grouts speculates that 3M "could" have used its registration of the diamondbrite.com domain name to obtain strategic commercial information about the number and geographic location of "hits" to the website. Southern Grouts argues that such a use would have fallen within the meaning of a use in commerce under § 43(a) of the Lanham Act. The only evidence Southern Grouts offers in support of that is Robert Moody's expert report explaining that a

"sophisticated entity like 3M could employ the ability to 'register' or otherwise record activity to a domain name even if there was no website associated with the domain name." As we have already explained, the district court did not abuse its discretion in ruling out that report.

Third, Southern Grouts argues that 3M used the DIAMOND BRITE mark in commerce when it bought a Google AdWord for "diamond brite." This Court has not yet determined whether the purchase of Google AdWords can be considered a use in commerce for purposes of 15 U.S.C. § 1125(a). This case does not present the issue because that allegation or theory is not properly pleaded in the second amended complaint. Although Southern Grouts filed a motion to amend its pleadings to include allegations that 3M bought the Google AdWord for "diamond brite," the district court denied that motion. As we have already explained, that denial was not an abuse of discretion. It follows that the issue of whether 3M's purchase of Google AdWords constitutes use in commerce within the meaning of 15 U.S.C. § 1125(a) was not properly before the district court, and we will not consider it now.

Because we agree with the district court that Southern Grouts has not established the requisite use in commerce, we do not reach the issues of whether its unfair competition claim is barred by laches or whether the district court erred

in finding that Southern Grouts failed to establish a likelihood of confusion.[10]  See

Reyes, 446 F.3d at 1205; Unimex, 594 F.2d at 1061.

**AFFIRMED.**

---

[10] Southern Grouts argues that the district court erred in finding that it had not established a likelihood of confusion and that the court overlooked the disjunctive nature of § 1125(a)'s requirement that a use in commerce is "likely to cause confusion, or to cause mistake." 15 U.S.C. § 1125(a) (emphasis added).  Even if that were true, Southern Grouts still would be required to establish use in commerce, which it failed to do.  See id.