[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-11966
Non-Argument Calendar

_____

D.C. Docket No. 1:11-cv-03420-CC

DOUGLAS M. TATUM,
JOHN M. TATUM,

Plaintiffs-Appellants,

versus

SFN GROUP, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(June 23, 2017)

Before MARCUS, MARTIN, and FAY, Circuit Judges.

PER CURIAM:

Douglas and John Tatum (the "Tatums") sued SFN Group, Inc. ("SFN") after a merger between SFN and the Tatums' company, Tatum, LLC, did not go as everyone hoped. The district court denied the Tatums' motion for leave to amend their complaint and granted summary judgment in favor of SFN. The Tatums appealed. After careful review, we affirm.

I.

A.

Douglas and John Tatum are brothers and co-founders of Tatum, LLC, an executive talent company. The Tatums left the company's Board of Directors and stepped back from its day-to-day operations, but they continued to hold, collectively, the largest ownership interest in the company.

In late 2009, Tatum, LLC was financially distressed and facing possible bankruptcy. The Board formed a special committee to evaluate a possible sale of the company. After evaluating potential transactions, Tatum, LLC chose to merge with SFN.[1] The company chose SFN because of SFN's financial resources, including its ability to pay cash, and its "meaningful presence" in the human capital sector. The two companies executed a letter of intent, which was signed by the Tatums' representative on the board of directors.

---

[1] At the time, SFN was "Spherion Corporation." SFN is Spherion's successor pursuant to a corporate reorganization.

Before finalizing the merger, SFN officials met with and collected information from various Tatum, LLC officers about the validity and collectability of the company's accounts receivable and the operation of its 401(k) benefits plan. Also before closing, the Tatums received a draft of the Agreement and Plan of Merger ("Agreement") between SFN and Tatum, LLC. The Tatums' legal counsel reviewed the draft, and the Tatums signed a written consent to the merger. The transaction closed the following day.

## B.

Under the Agreement, SFN paid the Tatum, LLC shareholders $46 million for the company, which included payments in cash and stock, as well as the assumption of debt and liabilities. Part of the purchase price would be paid after the closing through the release of two "holdback funds": the Indemnification Holdback and the Adjustment Holdback. Each fund was valued at $2.3 million.

The Indemnification Holdback would be used to compensate SFN if it incurred certain defined damages, including damages resulting from a breach of any representation or warranty contained in the Agreement. Under the Agreement, SFN had to notify Tatum, LLC of any indemnification claims "on or before" August 1, 2011. The Agreement referred to this as the "Termination Date."

The Adjustment Holdback would be used, among other purposes, to compensate SFN for any downward adjustment to the pre-closing working capital

3

estimate.  The parties agreed to "use their reasonable best efforts to cause [auditors] to prepare and deliver . . . , as soon as reasonably practicable following Closing, an audited balance sheet of [Tatum, LLC] as of the Closing Date."  If Tatum, LLC's actual working capital was less than the pre-closing estimate, SFN would keep that amount (the "adjustment deficit") from the Adjustment Holdback and disburse the balance of the fund to the Tatum, LLC shareholders.

The Agreement also provided for the appointment of a Holders' Agent to act "for and on behalf of" the Tatum, LLC shareholders, including the Tatums.  The Agreement gave the Holders' Agent "the power to make all determinations on behalf of" the shareholders.  Specifically, the Agreement tasked the Holders' Agent with authorizing all transactions related to the holdback funds, and taking "all actions necessary or appropriate" to satisfy SFN's claims against those funds. Any decision by the Holders' Agent was "binding and conclusive upon" all shareholders.  Tatum, LLC chose one of its senior partners, J. Robert Hipps, to serve as the Holders' Agent.

## C.

After the closing, SFN's audit showed Tatum, LLC's actual working capital was $1,794,925 less than the pre-closing estimate.  After accounting for certain offsets, the total adjustment deficit was $1,636,799.  SFN told Hipps that it had calculated an adjustment deficit of $1,636,799, and that it would therefore be

4

releasing only $663,201 from the Adjustment Holdback.  Hipps responded that he had no objections to this, and authorized SFN to release the $663,201 from the Adjustment Holdback to the Tatum, LLC shareholders.  The Tatums received their pro rata share.

SFN also kept funds from the Indemnification Holdback.  This withholding stemmed from misrepresentations Tatum, LLC made about its 401(k) plan.  Specifically, Tatum, LLC represented and warranted in the Agreement that it operated its 401(k) plan in compliance with applicable law.  But SFN discovered after the closing that the 401(k) plan was not compliant and was subject to potential disqualification by the IRS.  The Tatums do not dispute that Tatum, LLC breached the Agreement by failing to deliver a 401(k) plan that complied with the law.

After SFN discovered the compliance problems, Hipps met with SFN's lawyers to discuss options for fixing the 401(k) plan.  SFN's lawyers said the process of bringing the plan into compliance would, at a minimum, require SFN to incur legal expenses.  The lawyers recommended that SFN participate in the IRS's Voluntary Correction Program, in which a 401(k) plan sponsor may self-report a compliance issue to the IRS and receive approval for its proposed solution without incurring penalties or undergoing plan disqualification.

In light of the compliance failures, Hipps concluded that Tatum, LLC had breached a representation and warranty in the Agreement and agreed that SFN was entitled to indemnification for its legal fees in addressing the plan failures. Based on SFN's lawyers' estimate that the plan failures could cost several million dollars to rectify, Hipps agreed that SFN could retain the entire $2.3 million from the Indemnification Holdback. On the Termination Date, SFN sent Hipps a letter stating a claim against the Indemnification Holdback to recover damages from the 401(k) plan's compliance failures. Hipps approved the indemnification claim by email the same day and sent a signed letter the next day.

SFN entered the Voluntary Correction Program, and the IRS eventually announced it would not pursue sanctions or plan disqualification. As a result, SFN incurred only about $192,000 in legal fees and related costs. SFN told Hipps that it would withhold only this amount (plus other deductions not at issue) from the Indemnification Fund, and give the remainder to the Tatum, LLC shareholders. SFN disbursed $2,085,044.42 of the $2.3 million, and the Tatums received their pro rata share.

### D.

The Tatums filed a complaint against SFN in Georgia state court alleging various claims arising out of SFN's handling of the two holdback funds. SFN removed the case to federal court. The Tatums filed an amended complaint the

6

same day.  The amended complaint alleged claims for breach of contract, conversion, and equitable accounting.  The Tatums sought damages, specific performance, injunctive relief, and a declaratory judgment.

More than two years after the deadline in the district court's scheduling order for amending the pleadings, the Tatums filed a motion for leave to file a second amended complaint.  The Tatums sought to add, among other things, claims for fraud and negligent misrepresentation.  The district court denied leave to amend.

In March 2014, the Tatums moved for partial summary judgment on the claims arising out of the Indemnification Holdback.  SFN filed a cross motion for summary judgment on all of the Tatums' claims.  The district court granted SFN's motion in its entirety, denied the Tatums' motion, and dismissed the Tatums' claims with prejudice.  This is their appeal.

## II.

We review <u>de novo</u> the district court's grant or denial of summary judgment, viewing the facts, and drawing all reasonable inferences, in the light most favorable to the nonmoving party.  <u>Rioux v. City of Atlanta</u>, 520 F.3d 1269, 1274 (11th Cir. 2008).  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as

a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

We review for an abuse of discretion the district court's decision to grant or deny leave to amend the pleadings. Walker v. S. Co. Servs., 279 F.3d 1289, 1291 (11th Cir. 2002).

### III.

### A.

The Tatums first challenge the district court's grant of summary judgment for SFN on their breach of contract claim arising out of SFN's handling of the Indemnification Holdback. Specifically, the Tatums argue the district court erred in finding that SFN's claim for indemnification was valid because: (1) SFN was entitled to indemnification only for actual out-of-pocket losses, not unpaid liabilities; and (2) SFN's notice of claims for indemnification was untimely because the Agreement required that SFN provide notice prior to, rather than on, the Termination Date. We reject both arguments.

### 1.

The Tatums first argue that SFN needed an out-of-pocket loss in order to claim indemnification. Because SFN had not paid its legal expenses before making the claim, the Tatums say those expenses were not indemnifiable under the

8

Agreement.[2]  We conclude to the contrary.  The plain language of the Agreement

shows that it indemnified SFN not only for actual losses but also for liabilities not

yet paid.

Florida law governs our analysis of the Tatums' breach of contract claim.

When a federal court exercises jurisdiction based on diversity of citizenship, 28

U.S.C. § 1332, the court "must apply the choice of law rules of the forum state to

determine which substantive law governs the action."  U.S. Fid. & Guar. Co. v.

Liberty Surplus Ins. Corp., 550 F.3d 1031, 1033 (11th Cir. 2008) (per curiam).

The forum state here is Georgia, and Georgia courts enforce choice-of-law

provisions in contracts.  See Carr v. Kupfer, 296 S.E.2d 560, 562 (Ga. 1982).  The

Agreement contained a choice-of-law provision that said the "Agreement shall be

governed by and construed in accordance with" Florida law.  As a result, Florida

contract law applies.  See id.

Under Florida law, a written contract must be construed as a whole, see

McGhee Interests v. Alexander Nat. Bank, 135 So. 545, 548 (Fla. 1931), and to

---

[2] SFN says we should not consider this argument because the Tatums did not raise it below.  It is true that new claims generally may not be raised for the first time on appeal.  See BUC Int'l Corp. v. Int'l Yacht Council Ltd., 489 F.3d 1129, 1140 (11th Cir. 2007).  However, "new arguments relating to preserved claims may be reviewed."  Pugliese v. Pukka Dev., Inc., 550 F.3d 1299, 1304 n.3 (11th Cir. 2008).  The Tatums argued before the district court that the mere possibility of future IRS sanctions relating to the 401(k) plan's defects did not justify SFN's withholding of Indemnification Holdback funds because only expenses actually paid were subject to indemnification.  Both that argument and their argument on appeal rest on the proposition that the Agreement required SFN to have suffered an actual loss before making a claim for indemnification.  We therefore consider the Tatums' argument.

give effect to the parties' intentions.  See James v. Gulf Life Ins. Co., 66 So. 2d 62, 62 (Fla. 1953).  Where the language of the contract is "clear and unambiguous," we "give effect to the plain language," Equity Lifestyle Props., Inc. v. Fla. Mowing & Landscape Serv., Inc., 556 F.3d 1232, 1242 (11th Cir. 2009) (quotation omitted), and give the words of the contract "their commonly accepted meaning." Everhart v. Drake Mgmt., Inc., 627 F.2d 686, 690 (5th Cir. 1980).[3]  "We must read the contract to give meaning to each and every word it contains, and we avoid treating a word as redundant or mere surplusage if any meaning, reasonable and consistent with other parts, can be given to it."  Equity Lifestyle, 556 F.3d at 1242 (quotation omitted).

Under the express terms of the Agreement, SFN was entitled to indemnification not only for "losses, costs, [and] damages," but also for all "liabilities."  (Emphasis added.)  The plain meaning of "liability" includes obligations to pay that have not yet been satisfied.  See Liability, Webster's 3d New Int'l Dictionary (1993) (defining "liability" to include "an amount that is owed," a "pecuniary obligation[]," and "an obligation or duty which is owed by one person to another . . . to perform some act or to do something for the benefit of the latter").  To limit SFN's right to indemnification to expenses it had already paid

---

[3] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

would essentially write the term "liabilities" out of the Agreement—something we cannot do.  See Equity Lifestyle Props., Inc., 556 F.3d at 1242–43.  Thus, the Tatums' argument that SFN was allowed to claim indemnification only for out-of-pocket losses fails.

Other language in the Agreement reinforces this conclusion.  Section 9.4 required that in order to claim indemnification, SFN had to certify that damages "exist[ed]" and identify the date that each item of damages "was paid or properly accrued or arose."[4]  This language confirms that SFN was entitled to indemnification for unpaid obligations that had merely accrued or arisen.

The Tatums argue that under Florida law an indemnitor is not liable until its indemnitee suffers an actual, out-of-pocket loss.  Even assuming this is true as a general matter, this general rule cannot override the Agreement's specific language regarding indemnification.  Florida contract law merely provides a set of default rules that parties may choose to reject, so long as their agreements do not violate public policy.  See Hernandez v. Crespo, 211 So. 3d 19, 25 (Fla. 2016) ("Parties may freely contract around state law where the provisions of such contracts are not void as against public policy . . . .").  And the Tatums do not argue that a contract provision obligating an indemnitor to pay its indemnitee for unpaid liabilities violates Florida public policy.  By its plain terms, the Agreement entitled SFN to

---

[4] The Agreement referred to "losses, costs, damages, liabilities, and expenses" collectively as "[d]amages."

11

indemnification for both "losses" and "liabilities."  Thus, regardless of any general rule that might apply absent this specific language, SFN was entitled to be indemnified for unpaid liabilities.

2.

Next, the Tatums argue that because SFN gave notice of the indemnifiable expenses on—but not before—the Agreement's Termination Date (August 1, 2011), the notice was untimely.  This argument fails as well.

The plain language of the Agreement shows that the deadline for making claims against the Indemnification Holdback was on the Termination Date. Section 9.4 of the Agreement, which sets out when a notice of an indemnification claim must be delivered, says delivery must be made "on or before the Termination Date."  (Emphasis added.)  Other language in the Agreement is consistent with this.  For example, Section 9.2(a)—the provision that establishes the Termination Date—says that the right to seek indemnification "shall . . . continue in full force and effect until" the Termination Date.  (Emphasis added.)  The plain meaning of this is that SFN had "until" August 1, 2011 to make claims for indemnification, which allowed SFN to make a claim on that date.  See Fowler v. Gartner, 89 So. 3d 1047, 1048–49 (Fla. 3d DCA 2012) (per curiam) ("[Where] the day for payment ran until midnight June 1, 2011, [] the soonest [the party] could receive notice of default was 12:01 a.m. on June 2, 2011.").  Because it is undisputed that SFN gave

12

notice of its indemnification claims on the August 1st Termination Date, SFN's claims were timely.

The Tatums say the Agreement is ambiguous about whether claims must be filed on or before the Termination Date. They point to Section 9.3 of the Agreement, which describes indemnification claims as being "delivered . . . prior to the Termination Date." However, even accepting that this language in Section 9.3 creates some ambiguity, it does not follow that SFN was required to submit its indemnification claims before the Termination Date. Under Florida law, if two clauses of a contract are inconsistent, "the first shall be received and the latter rejected." Copacabana Records, Inc. v. WEA Latina, Inc., 791 So. 2d 1179, 1180 (Fla. 3d DCA 2001) (per curiam) (quotation omitted); see also Petrou v. Wilder, 557 So. 2d 617, 618 (Fla. 4th DCA 1990). Here, the earlier provision, Section 9.2(a), said that SFN had "until" the Termination Date to send a claim for indemnification. Further, the "general rule" under Florida law is that "where an act is to be performed within a specified period of time, the first day is excluded in the computation and the last day of the period is included." McMillen v. Hamilton, 48 So. 2d 162, 163 (Fla. 1950) (emphasis added); see also Klein v. City of New Smyrna Beach, 152 So. 2d 466, 469 (Fla. 1963). Under either of these rules of Florida law, SFN's submission of its indemnification claims on the August 1st Termination Date was timely. Therefore, the district court did not err in granting

13

summary judgment for SFN on the Tatums' breach of contract claim regarding the Indemnification Holdback.

## B.

The Tatums also challenge the district court's grant of summary judgment for SFN on their breach of contract claim arising out of the Adjustment Holdback. The Tatums' claim regarding the Adjustment Holdback is that SFN colluded with the management of Tatum, LLC to deprive them of holdback funds they were entitled to. More specifically, they claim that SFN and Tatum, LLC's leadership inflated the value of the company for the pre-closing estimate (for the purpose of inducing its shareholders to sell their shares), all the while intending to recover the inflated amount from the Adjustment Holdback through a post-closing audit. The Tatums say this breached the Agreement's implied covenant of good faith and fair dealing. The district court was right to grant summary judgment to SFN on this claim.

Under Florida law, "[a] breach of the implied covenant of good faith and fair dealing is not an independent cause of action, but attaches to the performance of a specific contractual obligation." Centurion Air Cargo, Inc. v. United Parcel Serv. Co., 420 F.3d 1146, 1151 (11th Cir. 2005). "[A] claim for a breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law in the absence of a breach of an express term of a contract." Id. at 1152. Here, the

14

Tatums identify no express contractual term that SFN allegedly violated. Indeed, they do not challenge the district court's determination that SFN complied with the Agreement's requirements for administering the Adjustment Holdback. Because the Tatums do not claim that SFN breached any express contractual obligation, they cannot maintain a claim for breach of the implied covenant of good faith and fair dealing.

Further, although the Tatums say that SFN deprived them of Adjustment Holdback funds, they do not dispute that SFN identified genuine discrepancies between Tatum, LLC's actual working capital, as computed by the post-closing audit, and the pre-closing estimate. Instead, they argue that SFN intentionally overstated the pre-closing estimate. But even assuming this wrongful conduct occurred, it necessarily happened <u>before</u> the Agreement went into effect, not during the course of its performance. As the Tatums acknowledge, their "theory is essentially one of fraud." But they did not plead fraud as a cause of action and they cannot now shoehorn a fraud claim into their contract claim. See <u>Gilmour v. Gates, McDonald & Co.</u>, 382 F.3d 1312, 1315 (11th Cir. 2004) (per curiam) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."). Therefore, we affirm the district court's grant of summary judgment to SFN on the Tatums' breach of contract claim for the Adjustment Holdback funds.

C.

Next, the Tatums argue that the district court erred in granting SFN summary judgment on their claim for conversion. Conversion is an "unauthorized act which deprives another of his property permanently or for an indefinite time." Senfeld v. Bank of N.S. Tr. Co., 450 So. 2d 1157, 1160–61 (Fla. 3d DCA 1984) (footnote omitted). An "[e]ssential element" of conversion is a "wrongful deprivation of property to the owner." Star Fruit Co. v. Eagle Lake Growers, 33 So. 2d 858, 860 (Fla. 1948) (quotation omitted). The Tatums say SFN converted money owed to them by unlawfully withholding it when dispensing the Indemnification and Adjustment Holdbacks. But because we conclude that SFN was entitled to withhold the amounts at issue from the two holdback funds, the Tatums were not "wrongful[ly]" deprived of any property. Id. Thus, the district court was correct in granting summary judgment for SFN on the conversion claim.

D.

The Tatums also challenge the district court's grant of summary judgment for SFN on their equitable accounting claim. "Under Florida law, a party seeking an equitable accounting must show the existence of a fiduciary relationship or a complex transaction and must demonstrate that the remedy at law is inadequate." Kee v. Nat'l Reserve Life Ins. Co., 918 F.2d 1538, 1540 (11th Cir. 1990). The

16

district court found the Tatums failed to show a genuine issue of material fact as to whether SFN owed them a fiduciary duty.[5]  We agree with the district court.

Under Florida law, "[w]hen the parties are dealing at arm's length, a fiduciary relationship does not exist because there is no duty imposed on either party to protect or benefit the other."  Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp., 850 So. 2d 536, 541 (Fla. 5th DCA 2003).  The merger between Tatum, LLC and SFN was an arm's-length transaction, so it cannot give rise to a fiduciary duty.  See id.

The Tatums say the fiduciary relationship arose from the fact that SFN held the two holdback funds in trust for the Tatum, LLC shareholders.  But the holdback arrangement cannot support a fiduciary relationship because it was established by the Agreement, which the parties negotiated at arm's length.  See id.  Therefore, the district court did not err in finding that the Tatums' equitable accounting claim failed as a matter of law.[6]

### E.

Finally, the Tatums argue that the district court erred in denying them leave to file a second amended complaint after the scheduling order's deadline for

---

[5] The Tatums' claim for an equitable accounting is based solely on the fiduciary duty prong—they do not attempt to satisfy the "complex transaction" prong.  Kee, 918 F.2d at 1540.

[6] For the same reasons we've affirmed the district court's grant of summary judgment for SFN on the Tatums' claims for breach of contract, conversion, and equitable accounting, we also affirm the district court's denial of the Tatums' request for a declaratory judgment.

17

amending the pleadings had passed.[7]  The Tatums sought to add claims for fraud and negligent misrepresentation, among others.  Generally, "[t]he court should freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  However, when a motion to amend is filed after a scheduling order deadline has passed, Federal Rule of Civil Procedure 16(b) requires the movant to show good cause.  See Sosa v. Airprint Sys., Inc., 133 F.3d 1417, 1418 n.2, 1419 (11th Cir. 1998) (per curiam); Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent.").  The district court found the Tatums failed to show good cause for modifying the scheduling order because they "fail[ed] to act diligently" in pursuing their claims.  We cannot say this was an abuse of discretion.

The Tatums concede they did not move for leave to file a second amended complaint until three months after discovery was completed.  They offer two reasons for this delay, but neither constitutes good cause.

---

[7] SFN argues that we lack jurisdiction over the Tatums' appeal of the district court's order denying their motion for leave to file a second amended complaint because the Tatums did not identify that order in their notice of appeal and the issue is not inextricably intertwined with the issues in the summary judgment order.  However, the Tatums' notice of appeal identified the district court's March 30, 2016 final judgment, and "[t]he appeal from a final judgment draws in question all prior non-final orders and rulings that produced the judgment."  Kong v. Allied Prof'l Ins. Co., 750 F.3d 1295, 1301 (11th Cir. 2014) (quotation omitted).  The district court's order denying the Tatums' motion for leave to file a second amended complaint "was a step toward the final judgment" in favor of SFN.  Id.  Therefore, we have jurisdiction to review that order on appeal.

First, they say they delayed seeking leave to file a second amended complaint because they were waiting to hear whether SFN would consent to the amendment. Even if this is true, the Tatums offer no explanation for why it was reasonable to wait for SFN's consent for three months after the close of discovery. See S. Grouts & Mortars, Inc. v. 3M Co., 575 F.3d 1235, 1242–43 (11th Cir. 2009) (per curiam) (finding plaintiff who delayed one month before moving to amend "waited too late" and "dallied too long").

Second, the Tatums argue they could not properly plead their claims for fraud, which must be pled with specificity under Federal Rule of Civil Procedure 9(b), until sufficient discovery had been taken to support the claims. But once discovery closed, the Tatums had all the evidence that would ever be available to them. Here again, they give no reason for waiting an additional three months to seek leave to amend. We cannot say the district court abused its discretion in finding that, because of this unexplained delay and lack of diligence, the Tatums did not show good cause to amend their complaint past the deadline in the court's scheduling order. See S. Grouts, 575 F.3d at 1242–43.

**AFFIRMED.**

19