[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-15761

_____

<table>
<tr><td>FILED</td></tr>
<tr><td>U.S. COURT OF APPEALS</td></tr>
<tr><td>ELEVENTH CIRCUIT</td></tr>
<tr><td>JUNE 21, 2012</td></tr>
<tr><td>JOHN LEY</td></tr>
<tr><td>CLERK</td></tr>
</table>

D.C. Docket No. 3:09-cv-00571-RS-MD

PENSACOLA MOTOR SALES INC,
A FLORIDA CORPORATION,
d.b.a. Bob Tyler Toyota,

Plaintiff - Appellant,

versus

EASTERN SHORE TOYOTA, LLC,
an Alabama limited liability company,
DAPHNE AUTOMOTIVE, LLC,
an Alabama limited liability company,
SHAWN ESFAHANI,
an individual,
DAPHNE ENTERPRISES, INC.,
an Alabama corporation,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(June 21, 2012)

Before TJOFLAT and CARNES, Circuit Judges, and MICKLE,* District Judge.

CARNES, Circuit Judge:

People who compete against each other in the same business or profession don't have to dislike one another. A few years back there was even a song lyricizing about "Lawyers in Love." But no one has ever written a song about "Car Dealers in Love," and if this case is any indication, no one ever will. These two car dealers are bitter business rivals in overlapping markets. One of them used a software program to compete more aggressively with the other one over the internet. That program produced a multiplicity of mini-websites, a host of hard feelings, and of course litigation. This is the appellate part of that litigation.[1]

---

* Honorable Stephan P. Mickle, United States District Judge for the Northern District of Florida, sitting by designation.

[1] The lawsuit that led to this appeal is not the only one between these parties or the sole indication of the bitterness between them. Last fall a state court jury awarded Shawn Esfahani and his company Eastern Shore Toyota, the primary defendants in the present case, $2.5 million in compensatory damages and $5 million in punitive damages for claims they brought against Bob Tyler Toyota, which is the plaintiff in the present case, and its sales manager. Order Deny. Defs.' Post-Trial Mot. at 10, 32, 35, Daphne Auto., LLC v. Pensacola Motors Sales, Inc., No. CV-2010-900230 (Ala. Mobile Cnty. Cir. Ct. Mar. 16, 2012). That $7.5 million judgment resulted from slanderous statements that Bob Tyler Toyota's salesmen had made about Eastern Shore Toyota and Esfahani, who was born in Iran but fled from there with his family when he was a teenager. Id. at 16, 18. The state court found that it had been part of Bob Tyler Toyota's sales strategy to tell customers who were considering shopping with Eastern Shore Toyota that Esfahani was a terrorist and that the money his dealership made was being used to support terrorism and to fight American troops in the Middle East, none of which was true. Id. at 16, 18–19. Bob Tyler Toyota employees had also referred to Eastern Shore Toyota as the "Middle Eastern Toyota" and "Taliban Toyota." Id. at 3.

The time period in which Bob Tyler Toyota was using its slanderous statements strategy

2

I.

Shawn Esfahani is a Hyundai and Toyota car dealer who owns Eastern Shore Toyota, Daphne Automotive, LLC, and Daphne Enterprises, Inc. (collectively "Eastern Shore" for short).  In the summer of 2009, Esfahani attended a Hyundai dealers' conference, where officials in Hyundai's corporate division introduced dealers to David Vaughan, Jr., who was the corporate division's internet marketing expert.  Vaughan offered to help the dealers revamp their websites and spruce up their technology systems.  Not that there's anything wrong with that.

Vaughan went further than that, however.  Over the next few weeks, he pitched two internet marketing strategies to Esfahani, one defensive and the other offensive.  The defensive strategy was for Esfahani, under Vaughan's tutelage, to buy and hold desirable domain names[2] in order to keep them out of competitors'

against Esfahani and Eastern Shore Toyota overlapped the time of Eastern Shore Toyota's internet strategy against Bob Tyler Toyota, which gave rise to the lawsuit leading to this appeal. Id.  In fact, Bob Tyler Toyota tried unsuccessfully to introduce evidence of this lawsuit in the slander trial. Id. at 6.  Earlier this year the state trial court denied Bob Tyler Toyota's post-judgment motions in that case, leaving intact the $7.5 million judgment against it. Id. at 10, 35. That judgment is now on appeal to the Alabama Supreme Court.  Notice of Appeal, Pensacola Motors Sales, Inc. v. Daphne Auto., LLC, No. 11110840 (Ala. Apr. 4, 2012).

[2] As another court has explained:

A domain name tells users where they can find a particular web page, much like a street address tells people where they can find a particular home or business.  Domain names consist of two parts:  the top level domain name (TLD) and secondary level

3

hands; some of those desirable domain names would incorporate trademarks of his competitors. Those defensive strategy domain names would not be operational because they would not be connected to a web page.

The offensive strategy that Vaughan proposed involved the creation of a large number of mini-websites, or microsites, using a computer program that he would license to Esfahani. By simply entering domain names into that software program and clicking a button, Vaughan could instantly mass produce microsites for Esfahani, each one using a name related in some way to the car business, for example, www.2009camry.com. Those microsites would either automatically redirect users who clicked on them to Eastern Shore's official websites or they would display a one-page website advertising Eastern Shore.

Esfahani agreed to both strategy proposals. In July and August 2009 through Eastern Shore, Esfahani signed contracts with Vaughan's company, Advanced Dealer Systems, for marketing services and use of Vaughan's software program. Within a couple of months, Eastern Shore went from owning about 40 domain names to owning around 4,000. The new domain names were purchased

---

domain name (SLD). The TLD is the suffix, identifying the nature of the site. The SLD is the prefix, identifying the site's owner. Thus in the domain name Duke.edu, ".edu" is the TLD, identifying the site as affiliated with an educational institution. "Duke" is the SLD, identifying the owner as Duke University.

Virtual Works, Inc. v. Volkswagen of Am., Inc., 238 F.3d 264, 266 (4th Cir. 2001).

4

from the popular domain name vendor GoDaddy.com, and some incorporated trademarks from Facebook, YouTube, and eBay, for example: www.facebooktoyota.com, www.youtubeusedcar.com, and www.ebayautoprices.com. More to the point of this case, some of the domain names that Eastern Shore purchased incorporated trademarks of its competitors, such as www.bobtylerprices.com.

Eastern Shore's new domain name marketing strategy caught the attention of eBay. The online auction website discovered one of the questionable domain names—www.ebaypreownedprices.com—and it emailed Eastern Shore about that name in September 2009. The email demanded that Eastern Shore stop using eBay's trademark in the domain name, disable any website linked to it, and allow the domain name's registration to expire instead of attempting to sell or transfer it to someone else. Ebay's email warned Eastern Shore that the "registration and use" of a domain name infringing on another's trademark violated the Lanham Act and that the "use, [sale], or offer for sale" of such a domain name violated the Anticybersquatting Consumer Protection Act; it also pointed out that the anticybersquatting act provides for statutory damages of up to $100,000 for each infringing domain name.

After receiving the email from eBay, Esfahani decided to "take it down."

5

The next day, acting through Vaughan, he gave that domain name back to GoDaddy.com. Esfahani notified eBay that he had complied with its demands. He did not, however, make any effort to review his other domain names to see if they infringed on any other trademarks.

There was more trouble. In October 2009 a sales manager at Bob Tyler Toyota discovered one of Eastern Shore's microsites: www.bobtylerprices.com. That microsite featured a photo of one of the car models that Bob Tyler Toyota sold, and it allowed visitors to enter their email addresses and their financial information to complete a credit application for a car loan. The phone number listed on the site, however, was not Bob Tyler Toyota's. It was Eastern Shore's. Bob Tyler Toyota employees found five other Eastern Shore microsites; all of them had virtually the same design, used some version of the Bob Tyler trademark, and listed Eastern Shore's phone number.

The general manager for Toyota's southeastern division told Eastern Shore that Bob Tyler Toyota objected to the microsites and urged Eastern Shore to disable them. Esfahani was shocked—"shocked," he said—to learn that those domain names were operational, and he immediately ordered Vaughan to disable the microsites. A few days later, attorneys for Bob Tyler Toyota sent Eastern Shore a cease-and-desist letter identifying six of the infringing microsites,

6

although by then Eastern Shore was already in the process of disabling them. The letter demanded that Eastern Shore forfeit the domain names and threatened to file a lawsuit under the federal anticybersquatting act unless Eastern Shore agreed to pay Bob Tyler Toyota $250,000 within seven days.

After the receipt of that letter, Esfahani and Vaughan blamed each other for the problem. Esfahani sent Vaughan a letter terminating their contracts and accusing Vaughan of having "misled" him into believing that purchasing the domain names was legal. Vaughan countered that Esfahani "went rogue," purchasing the domain names and hosting the microsites on his own despite Vaughan's warnings that doing so "was a real bad idea[]."

Bob Tyler Toyota's cease-and-desist letter was dated October 23, 2009. By the end of the next day, all of the microsites infringing on the Bob Tyler trademark had been disabled, except for two undetected ones.[3] On December 17, 2009, Bob Tyler Toyota sent Eastern Shore another letter, this one demanding the return of the domain names and a $1 million payment. A week later Esfahani surrendered to GoDaddy.com all of the domain names that infringed on the Bob Tyler

---

[3] Eastern Shore's initial review of its domain name list had not located two problem microsites because their domain names misspelled the Bob Tyler trademark: www.tyletoyota.com and www.tylrtoyota.com. Eastern Shore eventually discovered and disabled those microsites on January 3, 2010, and surrendered their domain names to GoDaddy.com on February 3, 2010.

7

trademark, except for the two undetected ones. A little over a week after that, Bob Tyler Toyota filed this lawsuit against Esfahani and Eastern Shore Toyota, along with Daphne Automotive, LLC, and Daphne Enterprises, Inc. (two related corporations controlled by Esfahani), all of which we are referring to collectively as "Eastern Shore," except when separate reference is necessary.

## II.

In its second amended complaint, which is the operative one, Bob Tyler Toyota brought six claims against Eastern Shore seeking injunctive relief and actual and statutory damages. All of those claims were based on Eastern Shore's registration or use of fourteen domain names that impermissibly incorporated the Bob Tyler trademark. The claims were: (1) false advertising under the Lanham Act, 15 U.S.C. § 1125(a); (2) unfair competition under the Lanham Act, id.; (3) violation of the Anticybersquatting Consumer Protection Act, id. § 1125(d); (4) unfair competition under Florida law; (5) violation of Florida's trademark dilution statute, Fla. Stat. § 495.151; and (6) violation of Florida's "Antiphising Act," Fla. Stat. § 668.704. Bob Tyler Toyota moved for summary judgment on all of the claims. In response to that motion, and about a month and a half before trial, Eastern Shore raised for the first time a statutory defense to the anticybersquatting claim: it allegedly "believed and had reasonable grounds to believe that the use of

8

the domain name[s] was a fair use or otherwise lawful," 15 U.S.C. § 1125(d)(1)(B)(ii).  Bob Tyler Toyota replied that Eastern Shore had waived that statutory defense by failing to plead the defense in its answer to the second amended complaint.  The district court allowed Eastern Shore to raise the defense.  The court also denied in full Bob Tyler Toyota's motion for summary judgment.

In its case-in-chief at trial, Bob Tyler Toyota did not prove any monetary damages resulting from Eastern Shore's registration or use of any of the domain names.  Because of that, only injunctive relief was available on the federal false advertising claim, the state and federal unfair competition claims, and the state trademark dilution claim.  Even without proof of actual damages, however, Bob Tyler Toyota still had a chance to recover statutory damages on its Florida antiphishing claim, see Fla. Stat. § 668.704(2)(b)(2), and on its federal anticybersquatting claim, 15 U.S.C. § 1117(d).

At the close of its case-in-chief, Bob Tyler Toyota moved for judgment as a matter of law on all of its claims, which the district court denied.  Eastern Shore moved for judgment as a matter of law on Bob Tyler Toyota's antiphishing claim, which the district court granted.  Eastern Shore then asked the district court to deny Bob Tyler Toyota any equitable relief on its claims for federal false advertising, state and federal unfair competition, and state trademark dilution.

9

Eastern Shore argued that no injunctive relief was warranted because it had already surrendered the fourteen domain names and disabled the microsites that went with them.[4]  Its position was that it should not be enjoined from doing what it had already quit doing before the lawsuit was filed.  The district court agreed, denying any injunctive relief because Bob Tyler Toyota failed to show any likelihood that Eastern Shore would re-register the domain names or reactivate the microsites.  The court's rulings left only the federal anticybersquatting claim for the jury to consider.

At the charge conference, Bob Tyler Toyota raised numerous challenges to the court's proposed jury instructions and special interrogatory verdict form. Among other things, it objected to the interrogatory on Eastern Shore's anticybersquatting statutory defense, which asked the jury whether Eastern Shore believed and had reasonable grounds to believe that its use of the domain names was a fair use or otherwise lawful.  The court overruled that objection.  Bob Tyler Toyota also asked the court to instruct the jury on the concept of willful blindness, to give a portion of the American Bar Association's pattern jury instructions on the anticybersquatting act's statutory defense, and to add to the instructions on damages a statement that the act's purposes are to deter and compensate.  The

---

[4] One of the fourteen domain names had never been connected to a microsite.

10

district court denied all of those requests.

When the court instructed the jury on the anticybersquatting act's statutory defense, it explained that Eastern Shore had the burden to prove that it had both "reasonable grounds to believe that the use of the domain names was [a] fair use or otherwise lawful" and that it actually "had this belief." The court told the jury that "reasonable grounds" meant that "an ordinary person in [the] defendants' position would have had those grounds."

The special interrogatory verdict form asked the jury a number of questions. The first one was: "Did Plaintiff prove by a preponderance of the evidence that any of the Defendants acted in a manner that constituted a violation of the Anticybersquatting Consumer Protection Act?" If the jury answered "yes" to that question, the second question asked it to identify which of the defendants had violated the anticybersquatting act for each of the fourteen domain names at issue.[5] The third question for the jury addressed the statutory defense. The first part of it asked: "Did any of the Defendants have a reasonably held belief that their use of the domain names was a fair use or otherwise lawful?" The second part of it asked the jury to specify which defendants, if any, "believed that the use of the domain

---

[5] As we explained earlier, the defendants were Esfahani, Eastern Shore Toyota, Daphne Automotive, LLC, and Daphne Enterprises, Inc. (which we are referring to collectively as "Eastern Shore").

11

names was a fair use or otherwise lawful." At the end of that interrogatory, the verdict form stated: "If your answer is 'Yes' as to all Defendants, then you have found a verdict for all Defendants . . . . If your answer is 'No' as to any Defendant, proceed to part 2." "Part 2" asked the jury to specify what damages it "attribute[d] to the use of [each] domain name." The jury did not get that far.

The jury returned a verdict answering "yes" to the first question, thereby finding that at least one of the defendants had violated the anticybersquatting act. On the second question, the jury found that Eastern Shore Toyota, not Esfahani or his other corporate entities, violated the anticybersquatting act by registering or using three of the domain names that the jury specified. On the third question, however, the jury decided that all of the defendants, including Eastern Shore Toyota, had a reasonable belief that their use of the domain names was a fair use or otherwise lawful, so it did not get to the question about what damages to award Bob Tyler Toyota. After the court read the verdict, Bob Tyler Toyota did not object to, or even mention, any inconsistency between the jury's finding that Eastern Shore was both in violation of the anticybersquatting act and protected by the act's statutory defense.

About a month after the verdict, Bob Tyler Toyota renewed its motion for judgment as a matter of law on all of its claims. It also moved for a new trial on

12

the anticybersquatting claim, arguing, among other things, that the jury verdict was inconsistent and that it was not supported by the evidence.  The district court denied both motions.

## III.

Bob Tyler Toyota has appealed, contending that the district court erred by denying:  (1) its motion for summary judgment, (2) equitable relief on three of its claims,[6] (3) its request for proposed jury instructions, (4) its renewed motion for judgment as a matter of law, (5) and its motion for a new trial.  It also contends that the district court erred by granting judgment as a matter of law in favor of the defendants on the antiphishing claim and by allowing them to present to the jury the anticybersquatting statutory defense.

## A.

Bob Tyler Toyota's contention that the district court erred by denying it summary judgment is a non-starter because a party may not appeal an order denying summary judgment after there has been a full trial on the merits.  Ortiz v. Jordan, __ U.S. __, 131 S.Ct. 884, 888–89 (2011) ("May a party, as the Sixth Circuit believed, appeal an order denying summary judgment after a full trial on

---

[6] In its briefs to this Court, Bob Tyler Toyota did not challenge the district court's denial of equitable relief on its state trademark dilution claim.  That issue is abandoned.  See Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989).

the merits?  Our answer is no.").

## B.

We review only for an abuse of discretion the district court's ruling that Bob Tyler Toyota is not entitled to equitable relief on its federal false advertising claim and its state and federal unfair competition claims.  Bradley v. King, 556 F.3d 1225, 1229 (11th Cir. 2009).  In determining whether the district court abused its discretion, we decide de novo any underlying legal issues but check factual findings only for clear error.  Id.

The district court denied injunctive relief because Bob Tyler Toyota could not show that Eastern Shore was likely to register or use the infringing domain names again.  As the Supreme Court explained a long time ago, even when voluntary cessation of unlawful conduct does not moot a claim (and there is no argument here that it did), a court has equitable discretion about whether to issue an injunction after the conduct has ceased.  See United States v. W.T. Grant Co., 345 U.S. 629, 632–34, 73 S.Ct. 894, 897–98 (1953).  Not only that, in this area a district court's "discretion is necessarily broad and a strong showing of abuse must be made to reverse it."  Id. at 633, 73 S.Ct. at 898.  To establish that a district court abused its discretion by not issuing an injunction when the unlawful conduct has stopped, the appellant "must demonstrate that there was no reasonable basis for

14

the District Judge's decision." Id. at 634, 73 S.Ct at 898.  Bob Tyler Toyota has not done that.

The evidence at trial proved that on October 24, 2009, the day after Bob Tyler Toyota sent its cease-and-desist letter, Eastern Shore disabled all of its infringing microsites with the exception of two.  The reason it did not disable those two is that misspellings in them prevented Eastern Shore from finding them.  When it finally did find those two remaining microsites, it promptly disabled them.  On December 24, 2009, Eastern Shore surrendered to GoDaddy.com all of the Bob Tyler domain names that it had discovered.  Moreover, Eastern Shore acknowledged its error in creating the microsites, fired its internet consultant, and promised to stop any infringing activity.  There was no evidence that Eastern Shore thereafter infringed the Bob Tyler trademark in any way or intended to do so in the future.  Because the evidence supported the district court's finding that Eastern Shore was not likely to infringe on the Bob Tyler trademark in the future, that finding is not clearly erroneous, there is a reasonable basis for the court's decision not to grant an injunction, and that decision is not an abuse of discretion.

C.

Bob Tyler Toyota's contention that the district court erred by granting Eastern Shore judgment as a matter of law on the state antiphishing claim is

15

meritless. Florida's antiphishing act allows the owner of a web page or trademark "who is adversely affected by [a] violation" to bring a lawsuit under that act. Fla. Stat. § 668.704(1)(c). At trial, Bob Tyler Toyota failed to prove any damages or otherwise show that it had been adversely affected by the microsites or the domain names. The district court correctly concluded that the antiphishing claim failed as a matter of Florida law.

## IV.

Bob Tyler Toyota presses a number of contentions related to the one claim that did go to the jury. It brought that claim under the Anticybersquatting Consumer Protection Act, which provides:

> A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, . . . that person . . . has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and registers, traffics in, or uses a domain name that . . . in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark . . . .

15 U.S.C. § 1125(d)(1)(A)(i)–(ii) (subsection designations omitted). The act lists nine factors that "a court may consider" when determining whether a domain name infringer had a "bad faith intent to profit" from the trademark. Id. §

16

1125(d)(1)(B).[7]  It also specifies that the factors that may be considered are "not

limited to" the nine that are listed.  Id.  And regardless of which direction the bad

faith factors point, the act states:  "Bad faith intent . . . shall not be found in any

---

[7] The nine factors listed in the act are:

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;
(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;
(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and
(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

15 U.S.C. § 1125(d)(1)(B)(i)(I)–(IX).

case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." Id. § 1125(d)(1)(B)(ii). That statutory defense is often referred to as the "safe harbor" defense. See, e.g., TMI, Inc. v. Maxwell, 368 F.3d 433, 438 n.6 (5th Cir. 2004).

## A.

Bob Tyler Toyota contends that for two reasons the district court erred by instructing the jury on the anticybersquatting act's statutory safe harbor defense and submitting an interrogatory covering that defense. First, it argues that Eastern Shore waived the safe harbor defense by failing to plead that defense in its answer to the second amended complaint. "Failure to plead an affirmative defense generally results in a waiver of that defense." Latimer v. Roaring Toyz, Inc., 601 F.3d 1224, 1239 (11th Cir. 2010) (citing Fed. R. Civ. P. 8(c)). This Court, however, has held that "if a plaintiff receives notice of an affirmative defense by some means other than pleadings, the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice. When there is no prejudice, the trial court does not err by hearing evidence on the issue." Grant v. Preferred Research, Inc., 885 F.2d 795, 797 (11th Cir. 1989) (quotation marks and citation omitted).

In Grant, the defendant raised the affirmative defense of statute of

18

limitations for the first time in a motion for summary judgment that was filed less than a month before trial. Id. The district court permitted the defense to be raised, and we upheld that ruling because the plaintiff had not shown any prejudice from the defendant's failure to raise the defense in the answer. Id. at 798. And we went on to hold that the defendant was entitled to judgment as a matter of law based on that defense. Id. at 798–99. The facts in Grant are similar to the ones in this case. Eastern Shore raised its anticybersquatting statutory defense a month and a half before trial in a motion for summary judgment, and Bob Tyler Toyota has not suggested that it suffered any prejudice from the delay in asserting the defense. The district court did not abuse its discretion in allowing Eastern Shore to raise the defense.

The second reason Bob Tyler Toyota argues that the district court erred in letting Eastern Shore's safe harbor defense go to the jury is that Eastern Shore was guilty of bad faith, which should have barred it from sailing into the safe harbor. That argument relies on a Fourth Circuit decision and the decisions of some other circuits following it. See Virtual Works, Inc. v. Volkswagen of Am., Inc., 238 F.3d 264 (4th Cir. 2001); see, e.g., Lahoti v. VeriCheck, Inc., 586 F.3d 1190 (9th Cir. 2009); Coca-Cola Co. v. Purdy, 382 F.3d 774 (8th Cir. 2004).

In the Fourth Circuit case, an internet service provider named Virtual Works

19

registered the domain name www.vw.net.  Virtual Works, 238 F.3d at 266.  At the time of that registration, Virtual Works' owners recognized the domain name's similarity to the Volkswagen trademark and agreed that they would sell the domain name to the car manufacturer for "'a lot of money'" if they could.  Id.  Virtual Works later told Volkswagen that if Volkswagen did not make an offer to purchase the domain name within 24 hours, Virtual Works would sell it to the highest bidder.  Id. at 270.  When Volkswagen would not purchase the domain name, Virtual Works filed a lawsuit for a declaratory judgment in order to protect its rights to the vw.net domain name, but Volkswagen counterclaimed, asserting that Virtual Works did not have any right to the name and had violated the anticybersquatting act.  Id. at 267.  The Fourth Circuit held that Virtual Works could not rely on the safe harbor provision because a "defendant who acts even partially in bad faith in registering a domain name is not, as a matter of law, entitled to benefit from the Act's safe harbor provision."  Id. at 270.

In the present case, Bob Tyler Toyota argues that Eastern Shore likewise should not be permitted to benefit from the safe harbor defense because it conceded in the district court that six of the nine § 1125(d)(1)(B) factors were present and weighed against Eastern Shore.  Those are the factors that the act says "a court may consider" when determining whether a domain name infringer had a

20

"bad faith intent to profit" from the trademark.  15 U.S.C. § 1125(d)(1)(B).

As we have explained before, however, "[a] court's analysis of whether a defendant had the bad faith intent to profit necessary to a cybersquatting claim is not based on a score card of the statutory factors."  Southern Grouts & Mortars, Inc. v. 3M Co., 575 F.3d 1235, 1249 (11th Cir. 2009).  No particular number of those factors requires a finding of a bad faith intent to profit.  The statute, after all, says that the factors are nonexclusive ones that "a court may consider."  15 U.S.C. § 1125(d)(1)(B)(i) (emphasis added); see also Sporty's Farm, L.L.C. v. Sportsman's Mkt., Inc., 202 F.3d 489, 499 (2d Cir. 2000) (noting that the most important grounds for finding bad faith "are the unique circumstances of this case, which do not fit neatly into the specific factors enumerated by Congress but may nevertheless be considered under the statute").  We do not read Virtual Works or any other decision that has been cited to us as holding that there is a statutory factors tipping point at which the safe harbor defense tumbles out of the case.  See Virtual Works, 238 F.3d at 269 ("We need not, however, march through the nine factors seriatim because the [act] itself notes that use of the listed criteria is permissive.").

The present case is different from Virtual Works where it was undisputed that the defendant had a bad faith intent to profit by selling or threatening to sell

21

the infringing domain name to the highest bidder if Volkswagen did not buy the name from it.  See id. at 270.  In this case, by contrast, there was no evidence that Eastern Shore intended to sell or threatened to sell any infringing domain names to anyone at any time.  There was some evidence that Eastern Shore intended to profit from the infringing domain names, but there was also evidence disputing that.  Where there is a genuine dispute about a material fact, such as whether Eastern Shore had a bad faith intent to profit or instead reasonably believed that its actions were lawful, resolving that dispute is a task for the jury.  See Tate v. Gov't Emps. Ins. Co., 997 F.2d 1433, 1436 (11th Cir. 1993) ("A judgment as a matter of law will not lie if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." (quotation marks omitted)).[8]

In addition to the absence of any evidence that Eastern Shore attempted to sell the improper microsites or use them to extort money from Bob Tyler Toyota, there is evidence that Eastern Shore relied on the advice of Vaughan, Hyundai's

---

[8] We also reject Bob Tyler Toyota's contention that the district court impermissibly allowed Eastern Shore to argue a mistake of law defense to the anticybersquatting claim at trial. Eastern Shore did not argue to the jury that it misunderstood the law and thus should be shielded from liability.  Instead, Eastern Shore argued that it believed and had reasonable grounds to believe that its actions were lawful based on Vaughan's professional advice, which was a permissible argument under the anticybersquatting act.  See 15 U.S.C. § 1125(d)(1)(B)(ii).

22

internet marketing expert; that it promptly discontinued the microsites as soon as it received notice they violated the anticybersquatting act; and that it then surrendered the infringing domain names to GoDaddy.com.  This is not to say that we would have decided the good faith versus bad faith issue the same way that the jury did, only that the evidence created a genuine issue of material fact for the jury to resolve.

## B.

Bob Tyler Toyota contends that the district court erred by rejecting three of its proposed jury instructions on the anticybersquatting claim.  We review only for an abuse of discretion a district court's refusal to give a requested jury instruction. Burchfield v. CSX Transp., Inc., 636 F.3d 1330, 1333 (11th Cir. 2011).  In refusing to give a requested jury instruction, "[a]n abuse of discretion is committed only when (1) the requested instruction correctly stated the law, (2) the instruction dealt with an issue properly before the jury, and (3) the failure to give the instruction resulted in prejudicial harm to the requesting party." Id. at 1333–34 (quotation marks omitted).

### 1.

Bob Tyler Toyota contends that the district court should have given the instruction it requested on willful blindness.  We cannot decide this issue on the

23

merits because we do not know exactly what the requested instruction, which is not in the record on appeal, said. Under the "absence equals affirmance" rule, "the burden is on the appellant to ensure the record on appeal is complete, and where a failure to discharge that burden prevents us from reviewing the district court's decision we ordinarily will affirm the judgment." Selman v. Cobb Cnty. Sch. Dist., 449 F.3d 1320, 1333 (11th Cir. 2006); accord Loren v. Sasser, 309 F.3d 1296, 1304 (11th Cir. 2002); Borden, Inc. v. Fla. E. Coast Ry. Co., 772 F.2d 750, 758 (11th Cir. 1985); Green v. Aetna Ins. Co., 397 F.2d 614, 615 n.5, 618–19 (5th Cir. 1968).[9] So it is here. Without knowing exactly what the requested instruction stated we cannot state whether it correctly stated the law. See Burchfield, 636 F.3d at 1333 (noting that the first step in deciding whether giving an instruction was an abuse of discretion is determining whether "the requested instruction correctly stated the law").

2.

Bob Tyler Toyota next contends that the district court erred by not including a portion of the American Bar Association's model jury instructions on the anticybersquatting act's statutory defense. The portion of the ABA model

---

[9] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

instruction that Bob Tyler Toyota proposed states: "Defendants lack such 'reasonable grounds' if they had multiple motives and not all of those motives would qualify for this defense."

In its briefs on appeal, Bob Tyler Toyota does not explain how it was prejudiced by the district court's rejection of this instruction. And it is not evident that Bob Tyler Toyota was prejudiced. We have held that:

> If the trial judge's instructions accurately reflect the law, he or she is given wide discretion as to the style and wording employed in its instruction. Further, under this standard, we examine whether the jury charges, considered as a whole, sufficiently instructed the jury so that the jurors understood the issues and were not misled. We will only reverse the lower court because of an erroneous instruction if we are left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations.

McCormick v. Aderholt, 293 F.3d 1254, 1260 (11th Cir. 2002) (quotation marks and citations omitted) (emphasis added).

In this case the district court instructed the jury that it "must consider all of the evidence." And a "jury is presumed to follow jury instructions." Adams v. Wainwright, 709 F.2d 1443, 1447 (11th Cir. 1983). We cannot say—and Bob Tyler Toyota does not attempt to argue—that in deciding whether Eastern Shore reasonably believed its registration or use of the domain names was lawful, the jury did not consider all of the possible motivations or attempted uses of the domain names. Bob Tyler Toyota argued that Eastern Shore had at least two

25

motivations: (1) to defensively register and hold the domain names, and (2) to divert consumers to its websites. It is implausible for the jury to have concluded that Eastern Shore had no reasonable belief that one of those motivations was lawful yet render a verdict that Eastern Shore had a reasonable belief that its actions were lawful. Either Eastern Shore had a reasonable belief or it didn't.

Considering all of the circumstances, we are not "left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." McCormick, 293 F.3d at 1260 (quotation marks omitted). Bob Tyler Toyota has not carried its burden of showing that it was prejudiced by the district court's refusal to give the ABA model instruction. See Burchfield, 636 F.3d at 1333–34 (stating that the failure to give a requested instruction is not an abuse of discretion unless it "resulted in prejudicial harm to the requesting party").

3.

Bob Tyler Toyota also contends that the district court erred when it refused to instruct the jury that the anticybersquatting act's purposes were to deter infringement and to compensate victims. The obvious purpose of any statute that authorizes the award of damages against one who violates it is to compensate the victim and to deter violations. There is no need to state the obvious, and Bob Tyler Toyota has presented no evidence that doing so would have altered the

26

jury's verdict in this case.  Because Bob Tyler Toyota was not prejudiced, the district court did not abuse its discretion by refusing to instruct the jury about the purposes of the act.  See id.

## C.

Bob Tyler Toyota complains that the jury's answers in its special interrogatory verdict were inconsistent.  They were.  The jury found both that Eastern Shore Toyota had violated the anticybersquatting act and also that it qualified for the protection of the act's safe harbor because it had a reasonable belief that the "use of the domain name[s] was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii).  Those answers are inconsistent because a defendant who falls within the scope of the safe harbor provision necessarily lacks the bad faith intent to profit that is necessary to violate the statute.  See id. § 1125(d)(1)(A).

Even so, Bob Tyler Toyota waived any argument that the verdict was inconsistent by not objecting before the jury was discharged.  See Walter Int'l Prods., Inc. v. Salinas, 650 F.3d 1402, 1419 (11th Cir. 2011) ("We have held that if the party challenging this type of verdict has failed to object before the jury is discharged, that party has waived the right to contest the verdicts on the basis of alleged inconsistency." (quotation marks omitted)).  The reason for this particular

27

raise-it-or-lose-it rule is that if the inconsistency is raised before the jury is discharged, the jury can be sent back for further deliberations to resolve the inconsistency in its verdict or interrogatory answers. Once the jury is gone, and has been free to talk to others about the case, that is not possible. Bob Tyler Toyota did not mention any inconsistency in the interrogatory answers until about a month after the jury rendered its verdict. That was way too late.

### D.

Bob Tyler Toyota's remaining contentions are directed at the denial of its renewed motion for judgment as a matter of law based on the sufficiency of the evidence and the denial of its motion for a new trial based on the weight of the evidence.

### 1.

We review de novo the denial of a motion for judgment as a matter of law, which necessarily means that we apply the same standard as the district court. Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1275 (11th Cir. 2008). That standard is heavily weighted in favor of preserving the jury's verdict. In applying it, "we consider all the evidence, and the inferences drawn therefrom, in the light most favorable to the nonmoving party. We then determine whether, in this light, there was any legally sufficient basis for a reasonable jury to find in

28

favor of the nonmoving party." Advanced Bodycare Solutions, LLC v. Thione

Int'l, Inc., 615 F.3d 1352, 1360 (11th Cir. 2010) (quotation marks, citation, and

alterations omitted). That determination is substantially guided by the principle

that "[c]redibility determinations, the weighing of the evidence, and the drawing

of legitimate inferences from the facts are jury functions, not those of a judge."

See Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1193 (11th Cir.

2004) (quotation marks omitted). It necessarily follows that we must "disregard

all evidence favorable to the moving party that the jury is not required to believe."

Id.

Bob Tyler Toyota's entitlement to judgment as a matter of law on its

anticybersquatting act claim turns on whether there was enough evidence for the

jury to find that Eastern Shore reasonably believed that its actions were lawful. If

Eastern Shore reasonably believed its actions were lawful, it had no bad faith

intent to profit; and if it had no bad faith intent to profit, it is not liable under the

act; and if it is not liable under the act, Bob Tyler Toyota was not entitled to

judgment as a matter of law. See 15 U.S.C. § 1125(d)(1)(B)(ii).

Bob Tyler Toyota argues that there was not enough evidence for the jury to

find that Eastern Shore reasonably believed that its actions were lawful because

the evidence at trial established a number of the "bad faith" statutory factors, see

29

15 U.S.C. § 1125(d)(1)(B)(i)(I)–(IX), which in turn ruled out any finding that Eastern Shore reasonably believed its actions were lawful.  The number of statutory factors, however, is not conclusive.

Regardless of how many statutory factors the evidence establishes, Eastern Shore cannot be liable for registering or using the Bob Tyler trademark with a bad faith intent to profit if it nonetheless "believed and had reasonable grounds to believe that the use of the domain name was . . . lawful."  Id. § 1125(d)(1)(B)(ii). To qualify for that safe harbor, Eastern Shore must have had both a subjective belief and an objectively reasonable belief in the lawfulness of its actions.  Viewed in the context of a motion for judgment as a matter of law, the question is:  when all  credibility determinations are made and all inferences are drawn in favor of the verdict, and all evidence disfavoring the verdict that the jury was not required to believe is disregarded, was there enough evidence to support the verdict that Eastern Shore lacked a bad faith intent to profit because it believed and had reasonable grounds to believe that its actions were lawful?  There was.

Esfahani testified that:  "Based on everything I knew, owning these domain names was legal, and is legal."   He also testified that if he had known that it was illegal to register the domain names, he would not have done so.  And there was evidence that Vaughan assured Esfahani that the practices he was proposing were

30

legal and that Esfahani reasonably relied on Vaughan's expertise and assurances.[10]

Esfahani had every reason to believe that Vaughan was a bona fide and independent internet marketing professional on whom he could rely. Vaughan had worked in the car dealership business for about twenty-seven years and had started working in internet marketing as early as 1995. He owned Advanced Dealer Systems, an internet marketing company whose clientele included car dealerships and manufacturers, such as Hyundai, Dodge, Jeep, and Chrysler. It was Hyundai's corporate division that introduced Vaughan to its dealership owners, including Esfahani, as a "preferred vendor" and the corporate division's internet marketing expert, someone who could help dealers revamp their websites and internet marketing strategies to compete in the twenty-first century economy.

In conversations with Esfahani, Vaughan touted offensive and defensive tactics that Eastern Shore could use in the ultra-competitive car dealership

---

[10] In Southern Grouts & Mortars, Inc. v. 3M Co., 575 F.3d 1235, 1247 (11th Cir. 2009), we held that 3M did not have a bad faith intent to profit when it continued to register, but did not otherwise use or attempt to sell, a domain name that incorporated a trademark of its competitor, Southern Grouts. That conclusion might seem to favor Eastern Shore in this case, but Southern Grouts does not stand for the proposition that every instance of registering domain names containing the trademark of another to prevent its use is permitted by the anticybersquatting act. In that case Southern Grouts failed to prove that 3M had a bad faith intent to profit by continuing to register a single domain name when 3M did so not to prey on customer confusion but to prevent confusion. Id. at 1245–47. The trademark used in the disputed domain name was similar to a trademark 3M owned, and 3M was seeking to protect its own trademark from erosion by its competitors. Id. at 1239, 1246.

business.  Offensively, Vaughan's Advanced Dealer Systems contracted with Eastern Shore to "build and host multiple websites" and to license Vaughan's proprietary microsite-producing program for eighteen months to net the dealership more customers.  Defensively, Vaughan outlined a strategy of obtaining and holding desirable domain names to prevent the competition from ever using them.  So one set of domain names would be used offensively to host one-page microsites or redirect users to Eastern Shore's official websites, and the other set would be inactive.  Despite Eastern Shore's purchase of thousands of domain names, many of them were never activated, which meant that they were not connected to their own microsites and did not redirect web visitors to Eastern Shore's actual website.  Vaughan was so convinced of the legality and propriety of the defensive strategy that he openly touted it in his deposition testimony, which was read into evidence at trial:

> If I was a guy like Shawn Esfahani, I would buy my competition up; and I would just not let them use it.  I would just keep [the domain names] dormant.  I think that's a good strategy. . . .  I've actually helped Hyundai buy Toyota domains just to keep them away from Toyota. . . .  Everybody does it.

There also was evidence from which the jury could have concluded that Vaughan inadvertently launched the microsites that used the Bob Tyler trademark instead of keeping those domain names dormant, as Esfahani testified he had

32

believed Vaughan would do.  Vaughan controlled his microsite-producing computer program.  With the click of a button, that program could generate microsites from data in an Excel spreadsheet.  The ease with which the program could be activated allowed for inadvertent activation.  And despite the fact that Eastern Shore purchased the domain names, Vaughan decided which domain server it should purchase to interact with his microsite program, Vaughan managed the GoDaddy.com domain name account, and Vaughan had access to all the domain names.  Although Vaughan denied activating the infringing microsites, the jury was not required to believe his denials.  At least one of the activated infringing microsites bore the name of his company in the tagline "Powered by Advanced Dealer Systems."  And it was undisputed that Vaughan and his company had exclusive access to the operational back-end of the microsites, where he could upload content and track visitors to the sites.  In his testimony about the infringing microsites, Esfahani stated that he "personally had no idea these things were hooked to [the] website generating machine" that Vaughan sold to him, and he expressed his belief that Vaughan may have inadvertently connected the infringing domain names to microsites.

Esfahani's reaction to the news that the trademark-infringing domain names had been activated is more evidence that he had not wanted those domain names to

33

be used offensively and was unaware that they were being used that way.  After Toyota's southeastern division general manager alerted Esfahani to the microsites using the Bob Tyler trademark, Esfahani immediately ordered Vaughan to deactivate them.  Esfahani testified about their conversation:

> I said, "Hey, there's a website out there that's been activated, how did that happen?"  He said, "Well, we're building these websites for you as"—and I said, "Well how did Bob Tyler's get on there?"
> And he said, "My programmers don't know what they're plugging in. They don't recognize Bob Tyler's."
> And I said, "You need to be much more selective.  Take anything that's got Bob Tyler's name on it off your process of building these websites."
> And he said, "Ok."  And that was the end of that.

That conversation occurred a few days before Eastern Shore received Bob Tyler Toyota's cease-and-desist letter, claiming that Eastern Shore was breaking the law with the microsites and threatening to sue it.  According to Eastern Shore's administrative director, when the letter came Esfahani "was upset that we were being told that this was something that was wrong, that we couldn't do it, that it was illegal . . . we never do anything that's illegal.  I mean he's very explicit about that."  Esfahani then called Vaughan again.  Recounting that conversation, Vaughan, who blamed Esfahani for the microsite mishap, testified that the activation of the infringing microsites likely was an error:  "I do believe [it] was an error, because his reaction was abrupt, immediately.  He called me in the morning.

34

This was before work started. . . .  This was an SOS call for sure." (Emphasis added.)  By the end of day on October 24, 2009, a day after Bob Tyler Toyota sent the cease-and-desist letter, Vaughan had disabled the known microsites that utilized the Bob Tyler trademark as Esfahani had demanded he do.

A few days later Esfahani sent a letter to Vaughan terminating Eastern Shore's contract with Vaughan's company.  The letter read:  "We entered into a contract with you under the assumption that purchasing these domains was legal.  Needless to say, I feel I've been misled, whether willful or not, therefore we need to end our contract immediately."  Within a couple of months and before this lawsuit was filed, Eastern Shore also surrendered to GoDaddy.com all of the Bob Tyler trademark-infringing domain names that it had found.  A few months later it also surrendered to GoDaddy.com the domain names that infringed on the trademarks of other companies.

In summary, construed in the light most favorable to the verdict, the evidence showed that Esfahani believed the actions he took and those he authorized Vaughan to take complied with the law.  As soon as he received notice about the existence of the infringing Bob Tyler microsites and before he even received a letter from Bob Tyler Toyota demanding that he do so, Esfahani ordered Vaughan to deactivate them.  Eastern Shore surrendered the domain

35

names using the Bob Tyler trademark before the lawsuit was filed in this case, and it surrendered the domain names using trademarks of its other competitors soon thereafter.  And, of course, there was no evidence that Eastern Shore ever attempted to profit by selling the infringing domain names to Bob Tyler Toyota or anyone else.

The actions and reactions of Esfahani and Eastern Shore were starkly different from those of defendants who have been held to have violated the anticybersquatting act.  See, e.g., Lahoti, 586 F.3d at 1203 ("[A] reasonable person who had previously been declared a cybersquatter in a judicial proceeding [] should have known that his actions might be unlawful."); Audi AG, 469 F.3d at 549–50 ("Following the cease and desist letters and this lawsuit, [the defendant] continued to sell advertising space [on the trademark-infringing website].  Even construing facts and inferences in a light most favorable to [the defendant], his belief that he had permission to use the trademarks was objectively unreasonable . . . ."); Coca-Cola Co., 382 F.3d at 788 ("[The defendant] argues that his belief that his conduct was protected by the First Amendment brings him within the ACPA 'safe harbor' provision. . . .  He continued to register and use domain names in the face of repeated complaints and warnings from the plaintiffs that such conduct was unlawful and even after the district court issued preliminary injunctive relief.

36

Moreover, [the defendant] had also been enjoined in a prior Internet case . . . . That injunction was affirmed despite [his] claim that his actions were protected by the First Amendment, and that appellate decision was filed before [the defendant] engaged in the conduct at issue in this case.").

Bob Tyler Toyota attempts to bring this case within the factual orbit of some of those opinions by arguing that the cease-and-desist email that Eastern Shore had received from eBay a month before it got Bob Tyler Toyota's cease-and-desist letter alerted Eastern Shore to the fact that its trademark infringing domain names likely violated the anticybersquatting act and the Lanham Act. Actually, what eBay's email stated was that Eastern Shore's "registration and use" or the "use, [sale], or offer for sale" of the domain name likely violated the law. (Emphasis added.) A jury could have reasonably found that after reading that email Esfahani still reasonably believed that defensively holding the domain names using the Bob Tyler trademark was not a violation of the law. And, as we have explained, a jury also could have reasonably found that Eastern Shore did not know that the microsites using the Bob Tyler trademark were operational, and thus in "use," until Toyota's southeastern division general manager told Esfahani about the microsites.

Bob Tyler Toyota also attempts to show on another ground why Eastern

37

Shore had no reasonable belief that its actions were lawful. Esfahani testified that years before meeting Vaughan, a competitor's disgruntled ex-employee contacted him and offered to sell him the competitor's trademarked domain names. The ex-employee had purchased the domain names for the competitor, while still employed by it, and at its direction. Esfahani turned down the offer, calling it "dirty pool." Bob Tyler Toyota argues that Esfahani's testimony shows that he knew that it was unlawful to register any domain name that included another company's trademark. But a reasonable jury just as easily could have inferred from that testimony that Esfahani simply did not want to purchase pilfered property. That does not mean Esfahani knew or should have known that he could not legally purchase unpilfered domain names from GoDaddy.com to prevent their use by competitors, especially when Vaughan was telling him that he could.

Bob Tyler Toyota also obtained a party admission under Federal Rule of Civil Procedure 36(a) from Eastern Shore admitting that it "purchased the Bob Tyler Domain Names with the intention of diverting consumers from [Bob Tyler Toyota's] website or business to [Eastern Shore's] own website." Bob Tyler Toyota introduced that admission into evidence as part of one of its exhibits. Ordinarily, under Rule 36(b), the effect of such a party admission would be to "conclusively establish[]" for these proceedings the fact that was admitted unless

38

the district court, upon a motion, allowed Eastern Shore to withdraw or amend that admission. Fed. R. Civ. P. 36(b).

But what ordinarily happens and what should have happened did not happen in this case. Although Eastern Shore never made a motion to withdraw its admission, Bob Tyler Toyota never objected to Eastern Shore asserting a position at trial that was directly contrary to that admission. It let Eastern Shore offer evidence and argue that it intended only to defensively hold the domain names, not to activate them and divert customers to its own websites. The district court apparently did not notice the inconsistency either. But the jury did. During the first day of deliberations, the jury sent a question to the district court asking it how it should resolve a conflict between the party admission and the "[p]resented testimony that [Eastern Shore] did not willfully activate a site."

Instead of arguing that the jury should be instructed according to the Federal Rules of Civil Procedure—that the Rule 36(a) admission established that fact conclusively—Bob Tyler Toyota's attorney, for unknown reasons, agreed with Eastern Shore's attorney that the jury should be instructed to give the admission and the trial testimony "the weight you believe it deserves." So, with the agreement of both sides, the district court instructed the jury that: "The Request for Admissions relates to the purchase of a domain name. The testimony

39

which you describe in your communication relates to the activation of a website. The two are different things. You should give each the weight you believe it deserves."

The next day the jury had another question about Eastern Shore's admission. It asked whether Eastern Shore was "admitting to only 'Defensive use' or to both Defensive and offensive use." The district court determined that Eastern Shore's admission dealt only with the intention it had in purchasing the domain names, not with the intent behind any of its later actions. On that basis, the district court suggested to the parties a jury instruction explaining that "the defendants' response simply admitted that sentence as it is worded." Eastern Shore's attorney was satisfied with that instruction. So was Bob Tyler Toyota's attorney, who said: "That's fine with me too, Your Honor." The district court then gave that instruction, and less than two hours later, the jury decided the case in favor of Eastern Shore.

The district court should have instructed the jury that Eastern Shore's Rule 36(a) admission established conclusively that Eastern Shore purchased the infringing domain names with the intent to divert consumers to its websites. But its error in not doing so was an error that Bob Tyler Toyota invited. A party that invites an error cannot complain when its invitation is accepted. Ford ex rel.

40

Estate of Ford v. Garcia, 289 F.3d 1283, 1293–94 (11th Cir. 2002).  Under the instructions that Bob Tyler Toyota agreed to, the jury was free to weigh the testimony Eastern Shore presented against its Rule 36(a) admission and give each "the weight [the jury] believe[d] it deserve[d]."  That, apparently, is what it did.

After considering all of the evidence, and the circumstances, we cannot say that the district court erred in denying Bob Tyler Toyota's motion for judgment as a matter of law.

2.

As for the denial of Bob Tyler Toyota's motion for new trial based on the weight of the evidence, "[n]ew trials should not be granted on evidentiary [sufficiency] grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence."  St. Luke's Cataract & Laser Inst., P.A. v. Sanderson, 573 F.3d 1186, 1200 n.16 (11th Cir. 2009) (quotation marks and alteration omitted).  The district court's determination that the verdict was not against the great weight of the evidence is one that we review only for an abuse of discretion.  Rosenfield v. Wellington Leisure Prods., Inc., 827 F.2d 1493, 1498 (11th Cir. 1987).  In light of the totality of the evidence, which we have already summarized, we cannot say that the district court abused its discretion in determining that the jury's verdict was not against the great weight of the

evidence.

**AFFIRMED.**